Georgia A. Staton, Bar #004863
Ravi V. Patel, Bar #030184
Justin M. Ackerman, Bar #030726
JONES, SKELTON & HOCHULI, P.L.C.
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004
Telephone: (602) 263-1700
Fax: (602) 200-7854
gstaton@jshfirm.com
rpatel@jshfirm.com
jackerman@jshfirm.com

Attorneys for Defendants Mohave County,
Arizona; Mohave County Sheriff Douglas
Schuster and Cynthia Schuster; Jordan T.
Selmanson and Ashley N. Selmanson; Richard
Schiller and Kathleen Schiller

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Ryan Andrew Krause, individually and on behalf of all statutory beneficiaries of Drey Krause, deceased,<br><br>Plaintiff,<br><br>v.<br><br>Mohave County, Arizona; Mohave County Sheriff Douglas Schuster and Cynthia Schuster; Jordan T. Selmanson; Ashley N. Selmanson; Richard Schiller; Kathleen Schiller,<br><br>Defendants. | NO. 3:17-cv-08185-SMB<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

8063651.1

Pursuant to Fed.R.Civ.P. 56, Defendants Mohave County, Arizona ("County"), Mohave County Sheriff Douglas Schuster ("Schuster") and Cynthia Schuster, Jordan T. Selmanson and Ashley N. Selmanson ("Selmanson"), and Richard Schiller and Kathleen Schiller ("Schiller") (collectively "Defendants") move for summary judgment on Plaintiffs' claims because: (1) Selmanson did not use excessive force against Drey Krause ("Decedent" or "Krause"); (2) Selmanson and Schiller properly provided medical assistance to Drey Krause; (3) there is no *Monell* liability; and (4) Plaintiff's state law wrongful death claims are subject to immunity under Arizona law and/or fail as a matter of law.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      RELEVANT FACTS.**

**A.      <u>Shanna Farris' February 13, 2017, 911 Call.</u>**

On February 13, 2017, in the early evening, Ms. Farris was outside her trailer in Topock, Arizona calling for one of her cats. [Defendants' Statements of Fact ("DSOF") ¶ 1]. Ms. Farris then heard a male voice coming from the direction of the Krause residence say "I've got your kitty, kitty, kitty. Come here. I got your kitty, kitty." [DSOF ¶ 2]. It "gave [Ms. Farris] the creeps." [*Id.* at ¶ 3]. She returned to her trailer and called her boyfriend, who suggested she go to the neighbor's house across the street. [*Id.* at ¶ 4]. As Ms. Farris started down her gravel driveway, she heard a gunshot and gravel scattered right behind her. [*Id.* at ¶ 5]. Ms. Farris testified she believed the gunshot came from the direction of Krause's trailer. [*Id.* at ¶ 6]. Ms. Farris hurried across the street to her neighbor's house and called 911 at approximately 6:45 p.m. [*Id.* at ¶ 7].

**B.      <u>MCSO Deputies Selmanson and Schiller Responded To The 911 Call.</u>**

MCSO Deputies Selmanson and Schiller, on-duty and in uniform, separately responded in marked MCSO vehicles at approximately 7:14 p.m. [*Id.* at ¶ 8]. Before responding, Selmanson reviewed the CAD data containing the information Ms. Farris reported in her 911 call. [*Id.* at ¶ 9]. Selmanson spoke with Ms. Farris as Schiller drove to the residence where shooting suspect Drey Krause lived. [*Id.* at ¶ 10]. Ms. Farris reiterated to Selmanson that she thought a gunshot was fired at her as she was crossing the street. [*Id.* at ¶

11]. Selmanson then also drove to the Krause residence. [*Id.* at ¶ 12].

### C. Selmanson Knocked And Announced His Presence At Drey Krause's Home, After Which He Was Met With The Barrel of A Shotgun.

Upon arriving at the Krause residence, at 7:18 p.m., Selmanson walked up the driveway and went to the side door. [*Id.* at ¶ 13]. Schiller walked toward the glass slider south of the side door. [*Id.* at ¶ 14]. Selmanson knocked on the door, announced "Sheriff's office" but got no answer. [*Id.* at ¶ 15]. He knocked a second time and again announced, "Sheriff's office." [*Id.* at ¶ 16]. The porch light by the door came on, and he heard the "fiddling" of the lock as if someone were unlocking it. [*Id.* at ¶ 17]. Drey Krause then began to open the door. [*Id.* at ¶ 18]. The first thing Selmanson saw was the barrel of a shotgun protrude out the doorway approximately two feet above the bottom of the doorway. [*Id.* at ¶¶ 18-19]. Schiller, who had stepped away from the slider, also saw the shotgun barrel protrude from the door. [*Id.* at ¶ 20]. Krause then began exiting the residence leading with a shotgun in his right hand, after which he grabbed the fore grip of the shotgun with his left hand. [*Id.* at ¶ 21]. Once outside, Krause continued to approach Selmanson with shotgun in hand. [*Id.* at ¶ 22].[1]

### D. Krause Refused To Obey Deputy Selmanson's Repeated Commands And Raised the Shotgun Toward Selmanson.

After observing the shotgun protrude from the door, Selmanson drew his weapon and loudly and repeatedly commanded Krause to "put the gun down" or to "drop the gun." [*Id.* at ¶ 24].[2] Ignoring those commands, Krause raised the barrel of the shotgun to a 90 degree angle toward Selmanson, at which point Selmanson fired three shots from his service handgun. [*Id.* at ¶ 27]. When Selmanson's weapon discharged, Krause's head was faced toward him but Krause's body was faced out and canted toward him slightly. [*Id.* at ¶ 28]. Two bullets struck Krause, who fell to the ground. [*Id.* at ¶ 29]. Roughly 75 seconds

---

[1] Selmanson testified in his deposition that when Krause first opened the door, he was six feet from Selmanson, but as Krause moved toward him and Selmanson backed away, the distance between them may have increased to 10-12 feet; that was Selmanson's estimation of the distance between them when he shot. [DSOF ¶ 23].

[2] Selmanson's commands were so loud that Schiller heard it [DSOF ¶ 25], as well as Ms. Farris and her neighbors from several lots away. [DSOF ¶ 26].

8063651.1

passed between the time Selmanson radioed he was "out with the subject" and when he fired shots. [*Id.* at ¶ 32]. Selmanson also testified he had "mere seconds" to decide what to do when Krause raised his weapon. [*Id.* at ¶ 33].

As the depictions in DSOF ¶ 34 illustrate, the above undisputed testimony, physical evidence collected, and medical examiner notes confirm Krause stepped outside his house, moved toward Selmanson, and raised his shotgun *before* Selmanson used deadly force.

**E.     Selmanson And Schiller Sought Emergency Medical Assistance.**

After Krause fell, Selmanson handcuffed him. [*Id.* at ¶ 35]. Roughly one minute after shots were fired at 7:19 p.m., Selmanson radioed "shots fired send medical." [*Id.* at ¶ 36]. The deputies then both tended to Krause while he was on the ground. [*Id.* at ¶ 37].

Neither deputy observed visible injuries, bleeding, or markings in Krause's shirt, so they did not know how to help him while waiting for emergency medical assistance to arrive, but they did tell Krause help was coming. [*Id.* at ¶ 38]. Moreover, the deputies did not move Krause because they did not want to worsen his condition before medical professionals arrived. [*Id.* at ¶ 39]. Defendants' medical expert has undisputedly opined that the gunshot wound to the lower left quadrant of Krause's abdomen was fatal and no amount of first aid by the deputies or paramedics on the scene would have saved his life. [*Id.* at ¶ 40].

Fire Department medics arrived around 7:28 p.m., approximately 8 minutes after the shooting. [*Id.* at ¶ 41]. They transported Krause to Valley View Medical Center, where he was pronounced dead shortly after arrival. [*Id.* at ¶ 42]. The medical examiner's report indicates Krause sustained two gunshot wounds, one penetrating the left side of his abdomen and the other going through his penis and right thigh. [*Id.* at ¶ 43]. Toxicology notes showed Krause's BAC was 0.271. [*Id.* at ¶ 44].

**F.     Mohave County Sheriff's Office Policies And Training Re: Use of Force And Emergency Medical Aid.**

Mohave County Sheriff's Office ("MCSO") has a variety of policies relating to administrative action, training, and discipline. [*Id.* at ¶ 45]. MCSO policy § 300.4 on use of force states, "[a deputy] may use deadly force to protect him/herself or others from what

3

1    he/she reasonably believes would be an imminent threat of death or serious bodily injury."

2    [*Id.* at ¶ 46]. Moreover, MCSO policy § 431.3 on medical aid and response states, "[w]henever

3    practical, members should take appropriate steps to provide initial medical aid …in

4    accordance with their training and current certification levels" but "[t]his should be done …

5    only when the member can safely do so." [*Id.* at ¶ 47].

6            Deputies Selmanson and Schiller testified they reviewed and received training

7    on the MCSO policy manual, which included these policies. [*Id.* at ¶ 48]. Selmanson also

8    testified he received firearms training from the Western Arizona Law Enforcement Training

9    Academy and MCSO, and received training on first aid, arrest procedures and investigation

10   procedures from MCSO. [*Id.* at ¶ 49]. Both Deputies Selmanson and Schiller also completed

11   training by Arizona POST. [*Id.* at ¶ 50]. Neither Deputies Selmanson or Schiller had any use

12   of force issues or discipline prior to the incident. [*Id.* at ¶ 51]. Excluding training, this was

13   also the first time Selmanson fired his service weapon while on duty. [*Id.* at ¶ 52].

14           **G.   <u>Officer Selmanson Was Cleared For His Use Of Force.</u>**

15           Following Officer Selmanson's use of force, MCSO performed a full

16   investigation pursuant to policy. [*Id.* at ¶ 53]. Officer Selmanson was cleared for his use of

17   force as self-defense pursuant to A.R.S. §§ 13-405, -404. [*Id.* at ¶ 54].

18   **II.   <u>PLAINTIFF'S SECTION 1983 EXCESSIVE FORCE CLAIM FAILS.</u>**

19           **A.    <u>Selmanson Did Not Use Excessive Force.</u>**

20           Plaintiff claims Selmanson violated the Fourth Amendment by using deadly

21   force against Krause. Fourth Amendment claims of excessive force are analyzed under an

22   objective reasonableness standard. *Scott v. Harris*, 550 U.S. 372, 381 (2007). The Court must

23   balance the extent of the intrusion on the individual's Fourth Amendment rights against the

24   government's interests in determining whether the officer's conduct was objectively

25   reasonable based on the totality of the circumstances. *Espinosa v. City & Cty. of S.F.*, 598 F.3d

26   528, 537 (9th Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). The Ninth

27   Circuit has set forth a three-step test to determine objective reasonableness:

28           First, we must assess the severity of the intrusion on the

8063651.1

individual's Fourth Amendment rights by evaluating the type and amount of force inflicted. Next, we must evaluate the government's interests by assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape. Third, we balance the gravity of the intrusion on the individual against the government's need for that intrusion. Ultimately, we must balance the force that was used by the officers against the need for such force to determine whether the force used was greater than is reasonable under the circumstances.

*Id.* (citations and quotations omitted). Here, all three "*Graham* factors" weigh in favor of summary judgment for Selmanson on Plaintiff's excessive force claim.

### 1.    Deadly Force Was Used

There is no dispute that Deputy Selmanson used deadly force when faced with Decedent's attempt to use deadly force and repeated refusal to obey lawful commands to drop his gun.

### 2.    The Government's Interest In The Use Of Force.

The Court evaluates the government's interest by assessing three factors: (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape. *Glenn v. Wash. Cty.*, 673 F.3d 864, 872 (9th Cir. 2011). Here, Selmanson indisputably employed deadly force after Krause refused to obey his lawful commands and posed a threat of serious harm or death to Selmanson by brandishing and raising his shotgun toward him.

### a.    Krause Was In Process Of Committing, Or Had Already Committed, Several Serious Crimes.

Regarding the first *Graham* factor, Krause refused to obey officer commands, brandished a shotgun and raised it toward Selmanson. Those actions clearly constitute attempted or completed dangerous felonies under Arizona law. *See e.g.,* A.R.S. §§ 13-1202 (threatening or intimidating); 13-1203 (assault); 13-1204 (aggravated assault with a deadly weapon); 13-2508 (resisting arrest); 13-1105(3) (attempted murder of a police officer). Thus, this factor strongly supports Selmanson's use of force. *Lowry v. City of San Diego*, 818 F.3d 840, 851–53 (9th Cir. 2016).

5

### b.   Decedent Posed A Serious Risk Of Imminent Harm To Selmanson.

The "most important" *Graham* factor is whether the suspect posed an "immediate threat to the safety of the officers or others." *Bryan v. MacPherson*, 630 F.3d 805, 826–28 (9th Cir. 2010). To justify significant force, "the objective facts must indicate that the suspect poses an immediate threat to the officer or a member of the public." *Id.* at 826.

As stated above, after Selmanson knocked and announced twice, Krause turned on his porch light and opened his door with the barrel of a shotgun protruding. Selmanson immediately and repeatedly commanded Krause to "drop the gun." Krause refused those lawful commands and continued stepping through the door toward Selmanson while gripping his shotgun with both hands. Despite this threatened deadly force and refusal to comply with lawful commands, Selmanson exercised extraordinary restraint by not using deadly force at that time. [DSOF ¶ 55]. Only when Krause began raising his shotgun toward Selmanson at a 90-degree angle was Selmanson forced to make the split second decision to use deadly force. Krause indisputably posed an immediate threat of death or serious injury to Selmanson at the time deadly force was used. *See e.g., Gonzales v. City of Antioch*, 697 Fed. Appx. 900, 902 (9th Cir. 2017) (affirming summary judgment where decedent failed to drop his gun before officers started shooting—either on his way out of the garage, when he saw the officers, when the officers yelled commands, or when he turned to go back to the garage.); *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) ("where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force"); *Prostrollo v. City of Scottsdale,* 2014 WL 4954392 at *6-12 (D. Ariz. 2014) (officers entitled to qualified immunity for deadly force when suspect had two halves of a broken pool cue in both hands, was not heeding officer commands, and advanced toward the officers).[3]

---

[3] Plaintiffs' expert cannot create an issue of fact where one does not exist in the record. *City & County of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765 (2015). So long as "a reasonable officer could have believed that his conduct was justified," a plaintiff cannot "avoi[d] summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless." *Billington v. Smith*, 292 F.3 1177, 1189 (9th Cir. 2002); *Cf. Saucier v. Katz*, 533 U.S. 194, 216, n. 6, (GINSBURG, J., concurring in judgment) (""[I]n close cases, a jury does not automatically

### c.    Decedent Failed To Heed Officer Commands.

The final *Graham* factor is whether the suspect resisted arrest or attempted flight. Here, Krause indisputably failed to heed *repeated* officer commands to relinquish and lower his weapon so the deputies could control him.

### d.    Other Factors Support Selmanson's Use Of Force.

The foregoing *Graham* factors are not exclusive. *Lowry*, 818 F.3d at 853. Courts also "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case whether or not listed in *Graham*." *Glenn*, 673 F.3d at 872. One pertinent factor is the availability of other tactics to subdue the suspect. *See Bryan*, 630 F.3d at 831; *see also Smith*, 394 F.3d at 701 (police officers must consider less intrusive alternatives). Importantly, officers "are not required to use the least intrusive degree of force possible." *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994).

Here, although not required, Selmanson attempted less intrusive alternatives to deadly force when he gave Decedent several loud and clear commands to drop his gun before shooting. While Plaintiff's expert opines that Selmanson should have attempted to use a TASER, baton, or pepper spray, this ignores the reality that Selmanson had to make a split second decision on what level of force was necessary to protect himself from Krause's active threat. Moreover, as Defendant's expert, Greg Meyer, explains, de-escalation tactics and nonlethal weapons (like a TASER or pepper spray) are not designed or intended for imminent deadly force situations such as the one Selmanson faced. [DSOF ¶ 56]. Nor was Selmanson constitutionally required to use force less than that guaranteed to stop the imminent threat of substantial harm Krause posed to him and to others.

Finally, Plaintiff's expert's opinion that Selmanson should have stepped forward and deflected Krause's weapon reflects "a complete lack of knowledge of the dynamics of deadly threats and the immediate risk of death to the foolish officer who would

---

get to second-guess these life and death decisions, even though a plaintiff has an expert and a plausible claim that the situation could better have been handled differently'") (quoting *Roy v. Inhabitants of Lewiston*, 42 F.3d 691, 695 (C.A.1 1994)).

7

attempt such a maneuver in this situation." [DSOF ¶ 57]. Given Krause's and Selmanson's positions, it would have been easy for Krause to immediately fire his shotgun had Selmanson made any move to approach him. For good reason, an officer is not legally required to engage in such risky tactics when a suspect points a shotgun toward him after refusing repeated commands to drop it. *See Forrester*, 25 F.3d at 807.

> ### 3. Selmanson's Use Of Force Was Objectively Reasonable Under The Circumstances.

Whether Selmanson's use of deadly force was "objectively reasonable" turns on "whether the degree of force used was necessary; in other words, whether the degree of force used was warranted by the governmental interests at stake." *Deorle*, 272 F.3d at 1282 (citing *Liston v. Cty. of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997); *Graham*, 490 U.S. at 396). A court may decide reasonableness as a matter of law if, "in resolving all factual disputes in favor of the plaintiff, the officer's force was 'objectively reasonable' under the circumstances." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 n.1 (9th Cir. 2001) (citing *Henrich*, 39 F.3d at 915). This includes whether it was reasonable for "[the officer] to believe—at the point when events were rapidly unfolding—that someone was at risk of serious physical harm." *Mitchell v. Miller*, 790 F.3d 73, 80 (1st Cir. 2015).

Selmanson's use of force was objectively reasonable under these circumstances. Selmanson originally responded based on a 911 call that Krause shot at a neighbor. After speaking with the neighbor and knocking on Krause's door, Selmanson was met with a rapidly evolving situation that took place in just 75 seconds, including being met with the barrel of a shotgun held by an individual who failed to respond to repeated lawful commands to drop his weapon. Selmanson exercised remarkable restraint in not immediately discharging his weapon. Krause continued failing to obey commands to drop his weapon, however, and positioned his shotgun in a firing position by raising it toward Selmanson. Faced with the threat of deadly force and Krause's failure to obey lawful commands, Selmanson was left with no choice but to discharge his firearm. Even then, Selmanson fired only three shots – the amount required to neutralize the threat. Based on the totality of circumstances, and as a

8

1   matter of undisputed facts and law, no reasonable jury could find Selmanson's conduct to be

2   objectively unreasonable. But even if Selmanson was mistaken as to the imminence of the

3   threat, it is axiomatic that "[a]n officer may be found to have acted reasonably even if he has

4   a mistaken belief." *Clark v. Bowcutt*, 675 F. App'x 799, 808 (10th Cir. 2017).[4]

5         **B.**    **Plaintiff's "Fourteenth Amendment" Excessive Force Claim Fails.**

6         Plaintiff's Complaint also purports to plead a *Fourteenth Amendment* excessive

7   force claim. [*E.g.,* Doc. 49 at ¶¶ 218, 230, 231 (referencing Fourteenth Amendment and/or

8   associated legal standards)]. However, the Supreme Court has held that the *only* cognizable

9   claim for excessive force in the context of a police officer shooting is under the Fourth

10   Amendment. *See Graham v. Connor,* 490 U.S. 386, 395 (1989). As a matter of law, Plaintiff's

11   alleged Fourteenth Amendment excessive force claim must be dismissed with prejudice.

12         Even if the Court were to construe this claim as a Fourteenth Amendment

13   familial association claim, it also fails. It is undisputed that the entire encounter between

14   Selmanson and Krause lasted approximately one minute. Selmanson also testified he had just

15   seconds to react to Krause raising and pointing a shotgun at him. Thus, Selmanson did not

16   have time to deliberate his choice. *See Gonzalez v. City of Anaheim*, 747 F.3d 789 (9th Cir. 2014)

17   (where officer does not have time to deliberate, his use of force shocks the conscience only if

18   he had a "purpose to harm" the decedent for "reasons unrelated to legitimate law

19   enforcement objectives."). There is no evidence Selmanson had an ulterior motive or purpose

20   to harm Krause, other than for legitimate law enforcement reasons (i.e., self-defense). Thus,

21   even if Plaintiff adequately pled a Fourteenth Amendment familial association claim, it fails.

---

22         [4] As more fully stated in Defendants' *Daubert* Motion Re: David M. Lauck, Plaintiff's

23   attempt to use an expert to opine otherwise can be summarily dismissed for two reasons.
First, an expert cannot opine on an issue of law. *See Webb v. Omni Block, Inc.*, 216 Ariz. 349,

24   353 (App. 2007) (under Rule 704, expert opinions addressing ultimate issues are excluded
when couched as legal conclusions because such beliefs by experts "tend to blur the separate

25   and distinct responsibilities of the judge, jury, and witness"); *United States v. Scop*, 846 F.2d 135,
140 (2d Cir. 1988) ("The problem with testimony containing a legal conclusion is in

26   conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury").
Second, Plaintiff's expert's opinions lack any credible factual basis, as shown in the

27   undisputed record above. *Florez v. Sargeant*, 185 Ariz. 521, 526 (1996) (affidavits without
relevant foundation and which only set forth ultimate facts or conclusions of law can neither

28   support nor defeat a motion for summary judgment).

**C.**   **Selmanson Is Entitled To Qualified Immunity On This Claim.**

Even if Selmanson used excessive force (which he did not), he would be entitled to qualified immunity given the threat of serious physical harm. The defense of qualified immunity requires judgment in favor of a government employee unless the employee's conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).[5] The defense is designed to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1319 (9th Cir. 1995). Indeed, if reasonable officers could disagree on whether the defendant's conduct was lawful, immunity applies. *Reynolds v. County of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1996), *overruled on other grounds, Acri v. Varian Assoc. Inc.*, 114 F.3d 999 (9th Cir. 1997). Moreover, clearly established law "must be particularized to the facts of the case," and "should not be defined at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 551–52 (2017); *see also Sharp v. City of Orange,* 871 F.3d 901, 911 (9th Cir. 2017); *see also Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (*citing White*, 137 S. Ct. at 551) (A right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law.").

The above cases show it was not clearly established that an officer violates the Constitution by shooting a suspect who points a deadly weapon at him and refuses to obey repeated commands to drop the weapon. Indeed, case law plainly demonstrates Selmanson acted reasonably in using deadly force. *See Tennessee v. Garner,* 471 U.S. 1, 11 (1985); *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005); *Reynolds v. Cnty. of San Diego*, 84 F.3d 1162, 1168 (9th Cir. 1996); *Prostrollo v. City of Scottsdale,* 2014 WL 4954392 at *6-12 (D. Ariz. 2014); *Villegas v. City of Anaheim*, 998 F. Supp. 2d 903, 908 n. 8 (C.D. Cal. 2014). Moreover, Selmanson's use of deadly force conformed to MCSO's policies and procedures, which

---

[5] Whether a reasonable officer could believe the defendant's conduct was lawful is an *objective* inquiry for the court. *Harlow v. Fitzgerald,* 457 U.S. 800, 819 (1982).

8063651.1

courts consider when deciding application of qualified immunity defenses. *See Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003). Thus, Selmanson is entitled to qualified immunity from Plaintiffs' excessive force claim because a reasonable officer could have believed his use of force against Krause was appropriate under the circumstances.[6]

## III.   PLAINTIFF'S DENIAL OF MEDICAL CARE CLAIM FAILS.

### A.   Deputies Selmanson & Schiller Provided Adequate Medical Care.

The Due Process Clause of the Fourteenth Amendment requires that police provide medical care to persons "who have been injured while being apprehended." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). To state a claim for denial of medical care under § 1983, Plaintiffs must show Defendants acted with "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F. 3d 1091, 1096 (9th Cir. 2006) (internal citation omitted). To prove deliberate indifference, Plaintiff must show Defendants engaged in "a purposeful act or failure to respond to the plaintiff's pain or possible medical need and resulting harm." *Id.* "Under the purpose to harm standard, liability turns on whether the police action was conducted as a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Fernandez v. Virgillo*, 2014 WL 2930749 at *7 (D. Ariz. June 30, 2014), *aff'd*, 651 Fed. Appx. 692 (9th Cir. 2016). Such a purpose to harm cannot be shown absent evidence the "actions were undertaken to induce . . . lawlessness, or to terrorize, cause harm, or kill." *Biscotti v. Yuba City*, 635 Fed. Appx. 419, 421 (9th Cir. 2016).

In the context of a failure to provide medical care claim, law enforcement officers are not required to render aid so long as they promptly summon medical assistance. *Maddox v. City of Los Angeles*, 792 F.2d 1409, 1415 (9th Cir. 1986) ("Due process requires that police officers **seek the necessary medical attention** for a detainee when he or she has been injured while being apprehended by **_either_** *promptly summoning the necessary medical help* **or** by taking the injured detainee to a hospital.") (emphasis added); *Tatum v. City & Cty. of S.F.*, 441 F.3d 1090, 1098–99 (9th Cir. 2006) ("a police officer who *promptly summons* the necessary

---

[6] For these same reasons, to the extent Plaintiff's Complaint alleges a Fourteenth Amendment familial association claim, Selmanson is entitled to qualified immunity.

1    medical assistance has acted reasonably for purposes of the Fourth Amendment") (emphasis

2    added); *Parker v. City of Los Angeles*, 726 Fed. Appx. 546, 548 (9th Cir. 2018) (same).

3           As shown above, there is no evidence the deputies failed to provide adequate

4    medical care and/or were deliberately indifferent toward Krause. Both deputies came to

5    Krause's aid immediately after shots were fired. Selmanson radioed for medical assistance

6    within one minute of shots being fired. Although the deputies testified they did not

7    administer first aid, that was because they could not see bleeding or bullet wounds and did

8    not want to potentially exacerbate Krause's wounds by moving him more than necessary. In

9    addition, there is no evidence that the deputies' failure to administer first aid was malicious or

10   for some other nefarious purpose such as to cause further harm or kill Krause.[7] In sum, the

11   deputies did what was legally required of them by promptly summoning medical help.

12   Defendants are entitled to summary judgment on the failure to provide medical care claim.

13           **B.      The Alleged Failure To Provide Medical Care Did Not Cause Krause's
14                      Death.**

15           A defendant may be liable in a § 1983 action only if he "subject[ed], or

16   cause[ed] to be subjected" the plaintiff to the deprivation of his constitutional rights. 42

17   U.S.C. § 1983; *see also Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir.2008) ("In a §

18   1983 action, the plaintiff must ... demonstrate that the defendant's conduct was the actionable

19   cause of the claimed injury."); *Burns v. City of Concord*, 99 F. Supp. 3d 1007, 1020 (N.D. Cal.

20   2015). As noted above, Defendants' medical expert indisputably opined that the gunshot

21   wound Krause suffered was fatal, and no care the deputies could have provided would have

22   saved him. Thus, Plaintiff cannot prove the deputies' alleged failure to administer emergency

23   medical care **caused** Krause's death. Summary judgment is proper for this additional reason.

24           **C.      Deputies Selmanson and Schiller Are Entitled To Qualified Immunity
25                      On This Claim.**

26           Finally, Deputies Selmanson and Schiller are entitled to qualified immunity on

27   _____

     [7] Selmanson also testified that there was no reason to stage for medical personnel
28   when the deputies first arrived because they were just investigating a possible crime and there
     were no reported injuries. [DSOF ¶ 58].

Plaintiff's denial of medical care claim. As shown above, *supra* § III(A), no legal authority put Deputies Selmanson and Schiller on notice that calling for medical assistance was insufficient to satisfy their duties to provide medical care. *See, e.g., Maddox, Tatum, Parker.* Moreover, no authority put Defendants on notice that failure to administer emergency medical care to Krause's gunshot wound (which goes far beyond the care a non-physician trained officer can provide) would violate Krause's Fourteenth Amendment rights. Because no applicable case with similar specific facts could put the deputies on notice that their actions violated Krause's rights, they are entitled to qualified immunity even if the Court finds a Fourth Amendment violation. *White,* 137 S.Ct. at 551–52; *Sharp,* 871 F.3d at 911.

## IV.   PLAINTIFF'S *MONELL* CLAIMS FAIL AS A MATTER OF LAW.

### A.   Plaintiff's *Monell* Claim Fails Because There Is No Individual Officer Liability Under § 1983.

Under 42 U.S.C. § 1983, if there is no constitutional violation, the municipality cannot be held liable as a matter of law. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (if the officer inflicted no constitutional injury, "it is inconceivable" that the municipality could be held liable); *see also Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978) (municipalities may not be held liable under § 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort."). As stated above, because Plaintiff suffered no constitutional violation by Deputies Selmanson and Schiller (or because Defendants are entitled to qualified immunity), summary judgment is appropriate on Plaintiff's *Monell* claim. *Daily v. City of Phoenix,* 2017 WL 6527298 at * 9 (D. Ariz. Aug. 8, 2017), *affirmed in part, reversed in part on other grounds*, 765 Fed.Appx. 325 (9th Cir. 2019).

### B.   Sheriff Schuster And Mohave County Are One And The Same.

When a County official like Sheriff Schuster is sued in his official capacity, the claims against him are one in the same as those against the County. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Ctr. for Bio–Ethical Reform v. L.A. Cty. Sheriff Dep't*, 533 F.3d 780, 786 (9th Cir. 2008) (sheriff was a "redundant defendant" in lawsuit against county

13

1   and county sheriff in his official capacity); *Mendiola–Martinez v. Arpaio*, 836 F.3d 1239, 1250

2   (9th Cir. 2016) (same). Plaintiff neither deposed Sheriff Schuster nor developed any facts

3   showing he was personally involved in the events giving rise to this action or the individual

4   deputies' training, hiring, or retention by MCSO. Thus, Plaintiff's claim against Sheriff

5   Schuster can only be against him in his official capacity, which is the same as a claim against

6   Mohave County. For this reason alone, Sheriff Schuster should be dismissed with prejudice.

7       **C.**     **Plaintiff's *Monell* Claims Fail On Their Merits.**[8]

8           **1.**     **Plaintiff's Failure to Train Claim Fails.**

9               To establish a "policy" of inadequate training, Plaintiff must offer "proof of

10  facts evidencing the local government's awareness of a high probability of harm if the

11  government failed to act." *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1453 (9th Cir. 1991). "A

12  pattern of similar constitutional violations by untrained employees is ordinarily necessary to

13  demonstrate deliberate indifference for purposes of failure to train[.]" *Flores v. Cty. of L.A.*,

14  758 F.3d 1154, 1159 (9th Cir. 2014). After all, "[w]ithout notice that a course of training is

15  deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen

16  a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 563

17  U.S. 51, 62 (2011). In addition, Plaintiff must identify the specific deficiency in the County's

18  training or supervision and establish that the deficiency directly caused the constitutional

19  deprivation. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Atwood v. Town of Ellington*,

20  427 F. Supp. 2d 136, 145 (2006). Plaintiff must also show the County made a "conscious" or

21  "deliberate" policy decision knowing this incident would likely result. *City of Canton*, 489 U.S.

22  at 389. Thus, municipal liability "is at its most tenuous where a claim turns on a failure to

23  train." *Connick*, 131 S. Ct. at 1359. Simply put, the County cannot be held liable absent

24  sufficient evidence of a "program-wide inadequacy in training." *Blankenhorn v. City of Orange*,

25  485 F.3d 463, 484–85 (9th Cir. 2007).

26              As a threshold issue, Plaintiff's *Monell* training claim fails because he cannot

27  ───────────────

28  [8] Plaintiff's Complaint Appears to Allege Duplicative *Monell* Claims. *Compare* Count III *with* Count IV. As a result, Defendants address all of the *Monell* claims in this section.

1  refute that Deputies Selmanson and Schiller completed all training requirements for

2  AZPOST certification. *See Mendez v. Cnty. of San Bernardino*, 540 F.3d 1109, 1123 (9th Cir.

3  2008), *overruled on other grounds*, *Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014)

4  (affirming dismissal where plaintiff failed to controvert evidence that officer's training met

5  state POST requirements); *Hillbloom v. Cnty. Of Fresno*, 2010 WL 4481770, at **11, 34 (E.D.

6  Cal. Nov. 1, 2010); *see also Ward v. Still*, 2012 WL 37518, *13-14 (E.D. Tenn. 2012) ("If . . .

7  police officers were certified by the POST Commission, then the issue of the adequacy *vel non*

8  of their training is resolved.").

9         In addition, the record lacks evidence of any pattern of deficient training to put

10  the County on notice that its training and policies regarding deputies, police procedures, use

11  of force, or emergency medical care were deficient. *Flores*, 758 F.3d at 1159. Specifically,

12  MCSO's policy on use of force and medical care properly instructed MCSO deputies on the

13  appropriate scope of force as well as medical care. Specifically, neither policy constitutes an

14  improper statement of the law on use of force or providing emergency medical care. Nor are

15  there any facts in the record involving prior incidents putting the County on notice that its

16  policies were deficient. Accordingly, there was no formal or informal policy, practice, custom

17  by the County that was the moving force behind Plaintiff's injuries.

18         To the extent Plaintiff contends the County should have trained Deputies

19  Selmanson and Schiller on a "surround and call out method," Plaintiff provides no evidence

20  or legal standard that such a policy was constitutionally required or that the County was on

21  notice that its policy of having officers approach a door without a surround or call out was

22  somehow deficient and caused constitutional injuries. *Connick*, 563 U.S. at 62. Moreover,

23  Plaintiff cannot show that "the need for [surround and call out] training [was] so obvious,

24  and the inadequacy so likely to result in the violation of constitutional rights, that the

25  policymakers of the [County] can reasonably be said to have been deliberately indifferent to

26  the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

27         Finally, to the extent Plaintiff asserts *Monell* liability on the ground that Officers

28  Selmanson and Schiller failed to follow MCSO policies and procedures, that claim fails as

1   well. In *City of Canton*, 489 U.S. at 390-91, the Supreme Court made clear: (1)"that a particular

2   officer may be unsatisfactorily trained or supervised will not alone suffice to fasten liability on

3   the city, for the officer's shortcomings may have resulted from factors other than the faulty

4   training program"; (2) liability will not attach where an otherwise sound program has

5   "occasionally been negligently administered"; (3) liability cannot be based on allegations that

6   the injury could have been avoided if an officer had better or more training or supervision,

7   because "[s]uch a claim could be made about almost any encounter resulting in injury, yet not

8   condemn the adequacy of the program"; and (4) "adequately trained officers occasionally

9   make mistakes; the fact that they do says little about the training program or legal basis for

10   holding the city liable."

**D.** **Plaintiff's Other *Monell* Claims Likewise Fail.**

12   Plaintiff's Complaint also appears to superficially allege other *Monell* claims. [*See*

13   Doc. 49 at ¶ 294]. While the Complaint does not shed any additional light on what *Monell*

14   violations Plaintiff asserts, Plaintiff's expert attempts to opine on whether the County has

15   *Monell* liability involving a failure to supervise the individual defendants and whether it ratified

16   their conduct. For the following reasons, (as well as those stated in Defendant's Daubert

17   Motion Re: David Lauck) none support *Monell* liability against the County.

**1.** **Failure to Supervise.**

19   Plaintiff's expert improperly opines that the County failed to adequately or

20   properly supervise Deputies Selmanson and Schiller, and failed to adequately and properly

21   supervise the dispatchers. Even if this opinion were proper, which it is not, there was no

22   failure to supervise here. First, no evidence shows the County should have provided

23   additional supervision to these deputies because neither had any prior discipline. Indeed,

24   Selmanson had never fired his gun in the field prior to this incident. And, Defendants are

25   unaware of any case authority requiring officers to be constantly operating under an acting

26   supervisor while on duty. Moreover, even if supervision was required, such purported failure

27   amounts to a single incident of officer misbehavior, which cannot establish *Monell* liability as

28   a matter of law. *McDade v. West*, 223 F.3d 1135, 1141 (9th Cir. 2000); *Vasquez v. City of Santa*

16

1    *Paula*, 13CV07726CBMAJWX, 2015 WL 12734071, at *3 (C.D. Cal. Mar. 11, 2015).

2                 **2.        Ratification.**

3            To prove ratification, Plaintiff must show the authorized policymaker approved both a

4    subordinate's decision and the basis for it. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127

5    (1988). This requires a showing that the decision triggering § 1983 liability "was the product

6    of a conscious, affirmative choice to ratify the [unconstitutional] conduct in question."

7    *Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003) (internal quotation marks omitted), *rev'd*

8    *on other grds*, *Brosseau v. Haugen*, 543 U.S. 194 (2004). In addition, the Ninth Circuit has held

9    that merely failing to discipline individual officers accused of unconstitutional conduct does

10   not amount to ratification. *See Haugen*, 351 F.3d at 393. Rather, Plaintiff must show the

11   County made a deliberate choice to endorse the officers' actions and the bases for them as its

12   own policy. *See Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992). Here, there was no

13   unconstitutional decision the County could ratify. Selmanson did not use excessive force and

14   neither deputy owed a duty to directly provide Krause medical care. For the same reasons,

15   Plaintiff's claim for failure to discipline Selmanson/Schiller fails. Accordingly, Plaintiff's

16   *Monell* ratification theory fails as a matter of law.

17   **V.    PLAINTIFF'S    WRONGFUL    DEATH    CLAIMS    AGAINST    ALL**
18          **DEFENDANTS FAIL AS A MATTER OF LAW (COUNTS V, VI).**

               **A.    Plaintiff's Wrongful Death Claims Fail Because Selmanson's Use of**
19                        **Force Was Justified.**

20           Plaintiff's wrongful death claims fail for the same reasons as his excessive force

21   claim. *See Marquez v. City of Phoenix*, 693 F.3d 1167, 1176 (9th Cir. 2013) (because officers

22   acted reasonably in using force, their claim cannot succeed under Arizona law); *Miller v. Clark*

23   *Cnty*., 340 F.3d 959, 968 n.14 (9th Cir. 2003) (affirming district court's judgment for

24   defendants on plaintiffs' state tort claims because they fell "along with [plaintiff]'s rejected

25   federal Fourth Amendment claim."). Arizona's justification statutes also preclude civil liability

26   for "engaging in conduct otherwise justified" under Arizona law, A.R.S. § 13-413, which

27   immunizes Selmanson for using deadly force in self-defense. *See* A.R.S. §§ 13-405, -404, -

28   410(C); *Marquez*, 693 F.3d at 1176; *Smith v. City of Chandler*, 2014 WL 1493004, at *5 (D. Ariz.

April 16, 2014). Because Selmanson reasonably believed his use of force was necessary to protect himself from Krause's threatened deadly force, he is statutorily immune from Plaintiff's wrongful death claims. *Marquez*, 693 F.3d at 1177.

**B.**     **Plaintiff's Failure To Plead Gross Negligence Is Fatal To His Wrongful Death Claim.**

In *Spooner v. City of Phoenix,* 246 Ariz. 119, ¶ 8 (App. 2018), *review denied* (July 8, 2019), the Arizona Court of Appeals recently clarified that common law qualified immunity for public officials exists despite the abolition of general sovereign immunity and certain statutory codifications of the qualified immunity defense under A.R.S. § 12-820.05. Common law qualified immunity under Arizona law provides public officials, including police officers, limited protection from liability when "performing an act that inherently requires judgment or discretion." *Id.* at ¶ 9. "If qualified immunity applies, a public official performing a discretionary act 'within the scope of [her] public duties' may be liable only if she 'knew or should have known that [s]he was acting in violation of established law or acted in reckless disregard of whether h[er] activities would deprive another person of their rights.'" *Id.* at ¶ 10. *See also Merritt, v. State of Arizona,* CV-17-04540-PHX-DGC, 2019 WL 6050237, at *21 (D. Ariz. Nov. 15, 2019); *Sweet v. City of Mesa,* CV-17-00152-PHX-GMS, 2019 WL 3532187, at *9 (D. Ariz. Aug. 2, 2019). Deputies Selmanson and Schiller face the same public policy concerns as the law enforcement officials in *Spooner* if their every action subjected them to a potential lawsuit. *See Spooner*, 246 Ariz. at ¶ 11 (noting "law enforcement by its nature is susceptible to provoking the hostilities and hindsight second-guessing by those directly interacting with police as well as by the citizenry at large... The public simply cannot afford for those individuals charged with securing and preserving community safety to have their judgment shaded out of fear of subsequent lawsuits."). Because the individual Defendants are also entitled to common law qualified immunity, Plaintiff's claim for simple negligence fails. Plaintiff's failure to plead gross negligence means his wrongful death claim fails in its entirety.

**C.**     **Plaintiff's State Law Wrongful Death Negligence/Battery Claims Fail.**

As shown above, the actions of the individual deputies on February 13, 2017

18

1   were not grossly negligent, and their use of force was justified under the totality of

2   circumstances. *See supra* §§ II, III. Moreover, there can be no claim for negligently shooting

3   someone intentionally. *Ryan v. Napier*, 245 Ariz. 54, 425 P.3d 230, 233 (2018) (a plaintiff

4   cannot assert a negligence claim based solely on an officer's intentional use of physical

5   force.). This case is devoid of facts or allegations that Selmanson did anything negligent in

6   self-defense. The negligence count thus fails to state a claim. Nor are there facts in the record

7   demonstrating Deputies Selmanson and Schiller were grossly negligent in providing medical

8   care (which again was never pled). Accordingly, Plaintiff's wrongful death claims against

9   Deputies Selmanson and Schiller contained in Counts V and VI also fail as a matter of law.

10      In addition, Plaintiff's only theory of liability on his negligence claim against

11   the County/Sheriff Schuster is one of vicarious liability. However, if the individual

12   Defendants (Selmanson and Schiller) have no liability, then neither can the County. *See Torres*

13   *v. Kennecott Copper Corp.*, 15 Ariz. App. 272, 274 (1971); *Law v. Verde Valley Med. Ctr.*, 217 Ariz.

14   92, 96, ¶ 13 (App. 2007); *Mulhern v. City of Scottsdale*, 165 Ariz. 395, 398 (App. 1990). Thus,

15   Plaintiff's negligence wrongful death claim against the County also fails.

16   **VI.   <u>PLAINTIFF'S PUNITIVE DAMAGES CLAIM FAILS.</u>**

17      Plaintiff is not entitled to punitive damages against the individual defendants

18   on his federal claim. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). To recover

19   punitive damages on a federal claim against an individual defendant, Plaintiff must prove

20   Defendants' conduct was motivated by evil motive or intent, or involved reckless or callous

21   indifference to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

22   Here, the individual Defendants acted appropriately and were not motivated by evil motive

23   or intent. Nor was any act taken by any Defendant in reckless or callous indifference to the

24   federally protected rights of others. Finally, punitive damages are not available under Arizona

25   law. *See* A.R.S. § 12-820.04.

26   **VII.   <u>CONCLUSION.</u>**

27      For the above reasons, Defendants request the Court to grant summary

28   judgment in their favor on all of Plaintiff's claims.

8063651.1

DATED this 6th day of December 2019.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ Georgia A. Staton
    Georgia A. Staton
    Ravi V. Patel
    Justin M. Ackerman
    40 North Central Avenue, Suite 2700
    Phoenix, Arizona 85004
    Attorneys for Defendants Mohave County,
    Arizona; Mohave County Sheriff Douglas
    Schuster and Cynthia Schuster; Jordan T.
    Selmanson and Ashley N. Selmanson;
    Richard Schiller and Kathleen Schiller

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of December 2019, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

/s/Karen Gawel

8063651.1