**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ryan Andrew Krause, et al., | No. CV-17-08185-PCT-SMB |
| Plaintiffs, | **ORDER** |
| v. | |
| County of Mohave, et al., | |
| Defendants. | |

Pending before the Court are two evidentiary motions: Plaintiff's *Daubert* Motion to Preclude Defense Animation, Drawings & Expert's Opinions, (Doc. 123, "Mot. 1"), and Defendants' *Daubert* Motion Re: David M. Lauck, (Doc. 129, "Mot. 2".) The parties filed responsive motions to each. (Doc 134, "Resp. 1; Doc. 141, "Reply 1"; Doc. 138, "Resp. 2"; Doc. 140, "Reply 2".) Neither party requested oral argument. The Court considers the parties' motions, relevant case law, and enters the following Order:

**I.     BACKGROUND**

    **a.  Factual Summary**

At approximately 7:14 p.m. two Mohave County Sherriff's Office ("MCSO") Deputies responded to the 911 call of Ms. Shanna Farris. Earlier that evening while calling for her cats outside her trailer, Farris heard a male voice coming from the direction of the neighboring Krause residence. Shortly thereafter, a gunshot, seemingly fired from the same location, impacted the gravel driveway not far behind her. Farris called 911. MCSO deputies Jordan Selmanson, and Richard Schiller arrived separately, took Farris' report,

and approached the Krause residence. Drey Krause and his mother were inside. The deputies walked up the driveway together then took separate positions near the entryway. Selmanson approached the side door of the residential trailer and Schiller passed that door and investigated the trailer's sliding glass door located further south. At the front door, Selmanson knocked and announced: "Sherriff's office." There was no answer. He knocked and announced a second time, backing away from the door immediately thereafter. Shotgun in hand, Drey Krause began to open the door. As the door opened, a shotgun barrel, pointing generally downward, protruded from the entryway. Continuing his backward retreat, Selmanson, at least twice, ordered Krause to drop his weapon. According to Selmanson, Krause exited the trailer and, now gripping the shotgun with both hands, began to raise the barrel to ninety degrees as he moved toward Selmanson. Seeing the shotgun rise and point in his direction, Selmanson engaged. He fired three shots. Two bullets found their mark and Krause later died of his wounds.

### b.     Procedural History

This Order covers *Daubert* challenges by each party. Plaintiff challenges the admission of computerized animations created to illustrate the shooting incident and the immediate moments preceding. Defendants seek exclusion of testimony by Plaintiff's police practices expert, David. M. Lauck, on both procedural and substantive grounds. Expert disclosures are governed by this Court's July 30, 2018 Scheduling Order which required disclosure of Plaintiff's initial expert testimony by June, 14, 2019, Defendants' initial expert testimony by August 2, 2019, all expert rebuttals by August 30, 2019, and set discovery to close on October 18, 2019. (Doc. 37.) Trial is currently set for September 15, 2020. (Docs. 132-33.)

## II.     LEGAL STANDARD

Under Rule 702 of the Federal Rules of Evidence, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise," provided:

(a) the expert's scientific, technical, or other specialized

>knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
>(b) the testimony is based on sufficient facts or data;
>
>(c) the testimony is the product of reliable principles and methods; and
>
>(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702(a)-(d). Rule 702 should be applied consistent with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion testimony.'" *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169, 109 S.Ct. 439, 102 L.Ed.2d 455 (1988)). In applying the Rule, the district court acts as a gatekeeper and determines whether expert testimony has "a reliable basis in the knowledge and experience of the relevant discipline" by the preponderance of the evidence. *See Daubert* 509 U.S. at 597, 113 S.Ct. 2786; Fed. R. Evid. 104(a). That "gatekeeping" obligation to admit only expert testimony that is both reliable and relevant is critical "considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony." *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063-64 (9th Cir. 2002). That said, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). Trial courts are accorded wide discretion in this "flexible" inquiry. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148-150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The Supreme Court has suggested several factors can be examined to determine if an expert's testimony is reliable: "(1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific community." *United States v. Hankey*, 203 F.3d

1160, 1167 (9th Cir. 2000) (citing *Daubert*, 509 U.S. at 592-94). "*Daubert*'s tests for the admissibility of expert scientific testimony do not require exclusion of expert testimony that involves specialized knowledge rather than scientific theory." *United States v. Bighead*, 128 F. 3d 1329, 1330 (9th Cir. 1997) (citing *United States v. Cordoba*, 104 F.3d 225 (9th Cir.1997)).

As a preliminary matter, the court must determine if a witness has the required expertise—"knowledge, skill, experience, or education"—under Rule 702(a). Courts then ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. While "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized knowledge," *Kuhmo Tire*, 526 U.S. at 156, 119 S.Ct. 1167, expert opinions based on unsubstantiated generalizations or opinions not derived by the scientific method must be excluded. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995). The proponent of expert testimony bears the burden of showing that the proposed testimony is admissible under Rule 702. *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *Lust ex. rel. Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). When a party that fails to carry this burden, their expert's opinions are not admissible. *Cooper*, 510 F.3d at 942.

**III. DISCUSSION**

Each party brings a motion to preclude admission of evidence under *Daubert* and the Federal Rules of Evidence. (*See* Docs. 123, 129.) The Court separately considers each below:

**a. Opinions of Plaintiff's Expert, David M. Lauck (Doc. 129)**

Defendants challenge admission of testimony by Plaintiff's expert witness, David M. Lauck, on four grounds—three substantive and one procedural. Specifically, they argue (1) that Lauck improperly offers legal conclusions, (2) that his conclusions are not based on sufficient data, (3) that he lacks adequate qualifications and foundation to make them, and (4) that some of Lauck's testimony is untimely under this Court's scheduling order.

**i. Legal Conclusions**

Defendants first argue that Lauck's opinions assert legal conclusions on the claims at issue and should be precluded. (Mot. 2 at 2-5.) Expert testimony, when "otherwise admissible," is not objectionable merely because it embraces an ultimate issue. Fed. R. Evid. 704(a). Determining whether testimony is "otherwise admissible" turns, in part, on whether the expert testimony "help[s] the trier of fact" in either "understand[ing] the evidence or . . . determin[ing] a fact in issue." Fed. R. Evid. 702(a). Such opinions do not aid the trier of fact in making a decision, but, instead, attempt to substitute an expert's judgment for that of the jury's. *Mukhtar v. Cal. State. Univ., Hayward*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002). Thus, courts recognize, "[a]n expert witness cannot give an opinion as to her legal conclusion, i.e. an opinion on an ultimate issue of law." *Mukhtar*, 299 F.3d at 1066 n.10 (quoting *United States v. Duncan*, 42 F.3d 87, 101 (2d Cir. 1994)); *see also Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004).

On this point, Defendants are correct—Lauck may not offer opinion testimony in the form of legal conclusions that presume the success of Plaintiff's arguments on specific claims. Many of Lauck's opinions take that form. For example, Lauck repeatedly opines that the use of force was "was not objectively reasonable." (Mot. 2, Ex. 1 at 20.) Whether Selmanson's actions were "objectively reasonable" in light of the facts and circumstances confronting them is a question reserved for the jury, or, if no material facts are in dispute, for the Court. *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994); *see also Torres v. Johnson Lines*, 932 F.2d 748, 751 (9th Cir. 1991) (expert testimony properly excluded where record did not reveal "any specific evidence that was so technical or complex that a jury could not have grasped it without the aid of experts"); *Quinn v. Fresno Cty. Sherriff*, No. 1:10-cv-01617 LJO BAM, 2012 WL 2995477, at *3 (E.D. Cal. 2012) ("Weighing the credibility of witnesses and resolving factual matters is not outside the common ability and knowledge of a layperson; it is the precise role that the law assigns solely to a layperson as juror." ) (quoting *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005)). Elsewhere in his report, Lauck goes further—he not only offers undisguised legal conclusions but concludes that elements of specific legal claims are satisfied. (*See e.g.,* Mot. 2, Ex. 1 at 33 & 35

(concluding that Selmanson caused "a harmful and offensive touching and the death of Krause).) The Court agrees that the opinions identified by Defendants constitute legal conclusions and are subject to exclusion. (*See* Mot. 2 at 3-4.)[1]

Plaintiff attempts, in vain, to save Lauck's testimony by arguing that because Lauck's opinions come "from the viewpoint of an objectively reasonable retired professional police officer," they are not opinions on an ultimate issue. (Resp. 2 at 17-18.) While expert opinions may indeed "embrace an ultimate issue," experts cannot intrude upon the province of the factfinder and render "legal conclusions" for which they are unqualified to make. *See Mukhtar*, 299 F.3d at 1066 n.10. So, while Lauck may not use the terms and adopt the conclusions identified, the Court does not bar him from expressing opinions on the issues that derive from his expertise in police practices that fall short of legal conclusions.[2]

### ii. Assessing Lauck's Qualifications and the Foundation for his Opinions

Lauck's qualifications are also at issue. Lauck, a police practices expert, is a former law enforcement officer, firearms instructor and licensed gunsmith.[3] Defendants argue that Lauck's opinions on the following topics are without foundation and that Lauck is unqualified to make them: (1) the trajectory of bullets fired by Selmanson; and (2) the failure to provide adequate medical care. (Mot. 2 at 9.)[4]

First, Defendants urge the Court to recognize that, whatever else he may be, Lauck

---

[1] Defendants' examples expand beyond those identified in this section. (*See* Doc. 129, Ex. 1 at 23 ("[The deputies] were deliberately indifferent to the medical needs of Krause, denying him due process"), 25 ("failed to adequately or properly train Selmanson), 31 (MCSO "failed to follow departmental policy and ratified improper conduct of Selmanson and Schiller" whom they also "failed to adequately or properly supervise"), 33 ([The deputies] "wrongful acts and neglect resulted in the unnecessary death" and thus "breached the duty of due care they owed to Krause").)
[2] For example, Lauck may opine on whether Selmanson's use of force or Defendants' conduct was appropriate under the circumstances. *Cf. Davis v. Mason County*, 927 F.2d 1473, 1484-85 (9th Cir. 1991) (noting that Rule 702 permits expert testimony comparing an officer's or municipalities conduct to "the industry standard").
[3] The Court finds Lauck generally qualified as a police practices and "use of force expert" under Rule 702. *See Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994) (recognizing that Rule 702 "contemplates a broad conception of expert qualifications.").
[4] In their Reply, Defendants withdrew an argument concerning Lauck's expert qualifications to opine on the possible use of less-than-lethal force. (Reply 2 at 3 n. 3.)

is not an expert in ballistics or crime-scene reconstruction. Defendants are correct. Lauck's experience and credentials reveal no specific training in ballistics whatsoever. (*See* Resp. 2, Ex. A, B.) Forensic ballistics and bullet trajectory analysis is highly technical area, subject to peer-reviewed research, and some degree of standardization.[5] Ballistics testimony requires specialized expertise. *See e.g., United States v. Johnson*, 875 F.3d 1265, 1280 (9th Cir. 2017); *United States v. Cerna*, No. CR 08-0730 WHA, 2010 WL 3448528, at *4 (N.D. Cal. Sept. 1, 2010); *United States v. Diaz*, No. CR 05-00167 WHA, 2007 WL 485967, at *11 (N.D. Cal. Feb. 12, 2007); *United States v. Scheffer*, 523 U.S. 303, 312 (1998) (noting that ballistic analysis is squarely within the province of expert testimony and not a layperson's knowledge). And expertise in the field certainly requires more than the ability to examine photographs of "wound path rods" as Plaintiff seemingly suggests. (Doc. 138 at 11.)

Lauck's opinions are entirely based on his *general* firearms and law enforcement experience. The Court does not discount that experience. However, that experience simply does not bear on his expertise to assess ballistic evidence or judge bullet trajectories. Lauck's "decades of experience as a [law enforcement officer], competitive shooter, [and] gunsmith" cannot replace qualifications in ballistic forensics and do not qualify him to opine on the highly technical area of bullet path reconstruction or ballistics. (Doc. 138 at 9); *see also United States v. Astirita*, No. 3:17-CR-00226-JO, 2018 WL 3097012, at *4-8 (D. Ore. June 20, 2018) (weighing expert use of differing techniques with varying degrees of standardized error in retracing a bullet's trajectory); *Dominguez v. City of Los Angeles*, No. CV 17-4557-DMG (PLAx), 2018 WL 6164278, at *9 (C.D. Cal. Oct. 9, 2018) (determining that because "experts still must be qualified to form the opinions that make up their testimony . . . [r]eading a coroner's report does not transform a police practices

---

[5] Ballistics experts draw on a range of publications to support their opinions. *See e.g., United States v. Astarita*, No. 3:17-CR-00226-JO, 2018 WL 3097012, at *7 n.3 (D. Ore. June 20, 2018) (citing Erwin J.A.T. Mattijssen, & Wim Kerkhoff, *Bullet trajectory reconstruction – Methods, Accuracy and Precision*, 262 Forensic Science Int'l 204 (2016)); *United States v. Fultz*, 18 F.Supp.3d 748, 757-759 (citing Dean H. Garrison, Jr., *Practical Shooting Scene Investigation: The Investigation and Reconstruction of Crime Scenes Involving Gunfire* 60 (2003) and Michael G.Haag & Lucien C. Haag, *Shooting Incident Reconstruction* 262 (2.ed. 2011).

expert into an expert on bullet trajectory analysis").[6] Lauck made no measurements or calculations to support his conclusions. His investigation is entirely devoid of scientific analysis for which he is unqualified to conduct. Other courts have excluded expert testimony in similar circumstances. *See Rojas Mamani v. Sanchez Berzain*, 07-22459-CIV, 2018 WL 2980371, at *2 (S.D. Fla. Feb. 26, 2018); *Lee v. City of Richmond, Va.*, 3:12CV471, 2014 WL 5092715, at *6 (E.D. Va. Sept. 30, 2014). Finding Lauck's general firearms expertise inadequate to support his opinions regarding bullet trajectories (and conclusions derived thereof), the Court will exclude Lauck's testimony on the topic.

Second, Defendants challenge Lauck's qualifications to opine on whether the officers failed to provide adequate medical care. Lauck is not a trained medical professional and has no medical training in gunshot wound treatment. (*See* Mot. 2, Ex. 3 at 249:3-20; *see also* Mot. 2, Ex. 1 at 23-25, Ex. 2 at 25.) Lauck obviously cannot testify as to the severity of Krause's injuries or opine on whether any medical care would have assisted Krause, much less *when* administering such care would assist. However, Lauck's expert experience in police practices permits him to offer limited opinions here. To the extent his testimony offers opinions on MCSO policies, their application to the circumstances, and standard practices implemented in other jurisdictions, the testimony is allowable.

### iii. Insufficient Support for Lauck's Opinions

Defendants next challenge whether Lauck's opinions are based on sufficient facts and data as required by *Daubert* and Rule 702. (Mot. 2 at 6.) Experts must base their opinions on specific facts. *Guidroz-Brault v. Missouri Pacific R. Co.*, 254 F.3d 825, 831 (9th Cir. 2001). When an expert fails to do so, or bases opinions on "subjective belief or unsupported speculation," *Daubert*, 509 U.S. at 590, the expert's testimony should be excluded. *Guidroz-Brault*, 254 F.3d at 829-832. "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995) (quoting *Brooke*

---

[6] Indeed, if such experience was sufficient, there would be no need for the existence of forensic ballistic science at all.

*Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)). Defendants see Lauck's opinions regarding Selmanson's account as purely speculative and his commentary about the deputies alleged violation of MCSO policies as not relevant.

### 1. Selmanson's Account of the Shooting

Defendants raise several objections to Lauck's opinions regarding Selmanson's account of the shooting. They first object to conclusions derived from Lauck's crime scene recreation and assessment of bullet trajectories. (Mot. 2 at 7.) For example, Lauck determined that based on the autopsy report, Medical Examiner deposition testimony and "trajectory of the bullet pass", (Mot. 2, Ex.3 at 79:12-13), that "Krause was perpendicular to Selmanson" when shot and that, thus, "even if Kruase's firearms was raised to the ninety-degree (90°) position, it was probably not pointing directly at Selmanson." (*Id.*, Ex. 1 at 23.) As discussed above, Lauck is unqualified to analyze the trajectory of the bullets fired by Selmanson and the conclusions based on such analysis are necessarily excluded. Having established the lack of expertise in ballistics and bullet trajectory analysis, insofar as Lauck's opinions regarding Selmanson and Krause's respective physical locations at the time of the shooting or Krause's body position, rely on such analysis they are also properly excluded. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (holding an expert is not permitted to give an opinion based simply on "subjective belief or unsupported speculation").

### 2. Violation of MCSO Policies

To the extent that Lauck opines that Selmanson and Shiller failed to follow MCSO procedures, Defendants characterize such opinion as "not relevant to any of the federal or state law claims at issue." (Mot. 2 at 10.) Plaintiff, largely ignoring Defendants' argument that the opinions lack bearing on the legal claims, emphasizes that Lauck's opinions on the MCSO violations "are relevant to and will help the jury understand the evidence." (Doc. 138 at 12.)

Defendants point out that Plaintiff's § 1983 municipal liability claim requires establishing a policy or procedure "amounts to deliberate indifference to the plaintiff's

constitutional right." *Plumeau v. Sch. Dist. No. 40 Cty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). Thus, Luack's opinion that Selmanson or Shiller's violated MCSO policies is irrelevant—internal policies, like the MCSO policies at issue here, do not create constitutionally protected due process rights. *See Devereaux v. Perez*, 218 F.3d 1045, 1056 (9th Cir. 2000); *see also Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009); *Case v. Kitsap Cnty. Sheriff's Dept.*, 249 F.3d 921, 929 (9th Cir. 2001); *Mesa v. City of New York*, 09 CIV. 10464 JPO, 2013 WL 31002, at *25 (S.D.N.Y. Jan. 3, 2013). Luack's opinions regarding the possible violation of MCSO regulations cannot establish a constitutional violation. Nonetheless, they may be relevant. (*Contra* Mot. 2 at 9); *see also Mellen v. Winn*, 900 F.3d 1085, 1104 (9th Cir. 2018) ("The [police practices expert] report should have been admitted to assist the trier of fact in determining whether [defendant's] conduct deviated so far from institutional norms that the jury could conclude that [defendant] was reckless or deliberately indifferent to [plaintiff's] constitutional rights."). In this regard, Lauck's opinions, though not dispositive, may inform the trier of fact's determination on whether violation of MCSO policies amounts to "deliberate indifference" or was the "moving force behind the constitutional violation." *See Hyun Ju Park v. City and Cty. of Honolulu*, 292 F.Supp.3d 1080, 1095-96. The Court will not exclude Lauck's assessments regarding possible violation of MCSO policies.

### iv. Exclusion of Lauck's Opinions as Untimely

At deposition, three months after the expert report submission deadline passed, Lauck for the first time expressed his belief that Krause was in his home when shot by Selmanson. (*See* Mot. 2, Ex. 3 at 221:9-226:19; 250:5-263:24; *see also id.*, Ex. 1 at 44.) Defendants argue Lauck's deposition testimony and amended reports filed thereafter are untimely, mischaracterize record evidence, and fall outside the limited scope of an expert's opinion in violation of Rule 26(a) and are subject to exclusion under Rule 37(c). (Mot. 2 at 10-12.)

1. Lauck's Opinions Are Untimely

Parties must make expert disclosures at the times and in the sequence that the Court

orders. *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011) (citing Fed. R. Civ. P. 26(a)(2)(D)). There is no question that Lauck's new opinions were untimely. This Court's scheduling order set a deadline for disclosure of Plaintiff's expert testimony under Fed. R. Civ. P. 26(a)(2) at June 14, 2019[7] and disclosure of rebuttal testimony at August 30, 2019. (Doc. 37.) Lauck shared the opinions in question during an October 14th deposition. Further, Lauck's opinions were novel, not included in any prior disclosure, and shared for the first time in the middle of his deposition. More importantly, the Court agrees with Defendants that Lauck's opinion—that Krause was inside his home when shot—was a significant, material change from his prior opinions. Neither Plaintiff nor Lauck can realistically argue otherwise. Lauck's opinion that Krause was shot "inside his *own* residence" is foundational to Plaintiff's argument the shooting was objectively unreasonable. (Doc. 121 at 1 (emphasis in original).) Indeed, Plaintiff mentions the fact sixteen times[8] in his motion for partial summary judgment. (*See generally id.*)

### 2. Lauck's New Opinions Are Not a Proper Supplementation Under Rule 26(e)

Plaintiff counters that he has a "duty to supplement" under Rule 26. (Doc. 138 at 6.) But Rule 26(e) creates a *duty*, not a right. *Luke v. Family Care and Urgent Medical Clinics*, 323 Fed.Appx. 496, 500 (9th Cir. 2009) (emphasis added). Supplementation means "correcting inaccuracies[] or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Keener v. United States*, 181 F.R.D. 639, 640 (D. Mont. 1998); *see also Plumley v. Mockett*, 836 F.Supp.2d 1053, 1062 (C.D. Cal. 2010) ("[S]upplementary disclosures do not permit a party to introduce new opinions after the disclosure deadline under the guise of a 'supplement.'") Lauck's opinions may have been new, but they were not based on new information and cannot properly be considered supplemental. *See Luke*, 323 Fed.Appx. at 500 ("Rule 26(e) does not create a loophole through which a party who submits partial expert witness

---

[7] Defendants incorrectly place the deadline one month later, on July 14, 2019.
[8] This tally does not include instances where Plaintiff emphasizes Krause's mother was also inside the trailer to emphasize the allegedly reckless nature of the shooting. (*See* Doc. 121.)

disclosures . . . can add to them to her advantage after the court's deadline for doing so has passed."). Lauck based his newly-shared opinions on evidence that had been in his possession for months—the same evidence cited by his original report.[9] Thus, the Court cannot characterize Lauck's late-disclosed opinions as supplemental. *See Plumley*, 836 F.Supp.2d at 1062 ("A supplemental expert report that states additional opinions or seeks to strengthen or deepen opinions expressed in the original expert report is beyond the scope of proper supplementation and subject to exclusion under Rule 37(c).") (quoting *Cohlmia v. Arden Health Servs., LLC*, 254 F.R.D. 426, 433 (N.D. Okla. 2008)).

### 3. Plaintiff Does Not Show the Rule 26(a) Disclosure Violation is Either Substantially Justified or Harmless

As if anticipating an unfavorable ruling on this point, Plaintiff pivots to alternative, and ultimately futile, arguments. First, Plaintiff argues the record supports Lauck's conclusion. (Doc. 138 at 4-6.) This argument sidesteps timeliness entirely. Plaintiff is of course welcome to present arguments he believes are justified by the record, but not through an untimely expert report.

Second, Plaintiff paints Defendants' concerns "as nothing but a technical or academic exercise to seek to exclude testimony." (Doc. 138 at 4.) Not so. It is the disclosing party's burden to provide timely, accurate, and sufficient Rule 26(a)(2)(B) disclosures. Plaintiff missed the deadline for initial expert reports by four months. In such instances, Rule 37(c)(1) acts as a "self-executing," "automatic" sanction to "provide[] a strong inducement for disclosure of material . . ." *Yeti*, 259 F.3d at 1106 (citing Fed. R. Civ. P. 37, Advisory Committee's Note (1993)).

Third, and lastly, Plaintiff sees no prejudice in the tardy disclosure and emphasizes that Defendants do not claim prejudice.[10] (Doc. 138 at 7.) Presumably, Plaintiff references prejudice with Rule 37(c)(1) in mind. *See Lanard Toys Ltd. v. Novelty, Inc.*, 375 Fed.Appx. 705, 713 (9th Cir. 2010) (identifying "the ability of [a] party to cure the prejudice" as one

---

[9] Lauck himself attested to this, admitting he formed his opinions during deposition preparation after reviewing the evidence on which he based his original, timely report. (*See* Doc. 138 at 4-5 (describing how Lauck's deposition preparation "made him go back and review everything again", resulting in new opinions)

[10] Defendants do argue they are prejudiced, albeit in their reply. (*See* Doc. 140 at 3.)

- 12 -

factor amongst others that courts consider in enforcing Rule 37(c)(1)). Rule 37(c) "gives teeth" to Rule 26 "by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed," *Torres v. City of Los Angeles*, 548 F.3d 1197, 1212-13 (9th Cir. 2008),[11] "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). But the burden to show the failure was justified or harmless is Plaintiff's. *See Torres*, 548 F.3d at 1213; *see also see also Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove harmlessness."); *Plumley*, 836 F.Supp.2d at 1064 ("The party facing the sanction carries the burden of demonstrating that the failure to comply with rules concerning expert testimony is substantially justified or harmless.").

The Court finds the harm to Defendants readily apparent and justification for Plaintiff's untimeliness wanting. To determine whether a violation is substantially justified or harmless, Courts consider the following factors, among others: (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption at trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence. *Carrillo v. B&J Andrews Ent., LLC*, No. 2:11-cv-01450-RCJ-CWH, 2013 WL 420401, at *3 (D. Nev. Jan. 13, 2013); *see also Lanard Toys Ltd. v. Novelty, Inc.*, 375 Fed.Appx. 705, 713 (9th Cir. 2010).[12] That Defendants were prejudiced and surprised in this instance is self-evident. In the middle of a deposition months after the scheduled deadline for both initial and rebuttal reports, Lauck, for the first

---

[11] In relevant part, Rule 37(c)(1) provides:

> "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness or supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."

Fed. R. Civ. P. 37(c)(1).

[12] In the Ninth Circuit, when imposing a sanction that amounts to a dismissal of a claim pursuant to Rule 37(c), the district court must conduct a harmlessness inquiry required and consider the availability of lesser sanctions. *R & R Sails, Inc. v. Insurance Co. of Penn.*, 673 F.3d 1240, 1247-48 (9th Cir. 2012). Neither party argues a lesser sanction is possible or appropriate and the Court finds none available with trial only months away. Further, as Lauck's untimely opinions are based on bullet trajectory analysis which he is unqualified to conduct, exclusion is warranted on independent grounds, rendering a lesser sanction for untimeliness futile.

time, shared fresh conclusions that differed materially from his prior opinions. This deprived Defendants the opportunity to rebut Lauck's new opinions with expert testimony of their own, meaningfully depose Lauck on the new opinions, or suitably prepare for Lauck's examination. With this context, Plaintiff's claim that despite being surprised with new, materially significant expert opinions in the course of deposing, Defendants "had an opportunity to fully explore the updated opinions during the deposition" is a bit hard to swallow. (Doc. 138 at 6.) What's more, Defendants had little opportunity to cure that prejudice. Lauck's surprise testimony came *four days* prior to closure of all discovery and months after Plaintiff's initial expert disclosure deadline. (*See* Doc. 37.) An argument that the untimeliness of Lauck's opinions is substantially justified is even less supportable. As discussed, Plaintiff (and Lauck, in deposition) admit the newly formed opinions were based on *review* of evidence already in-hand—a failure of diligence rather than some factor outside Plaintiff's control. Aside from a bare conclusion that excluding Lauck's opinions would be unjust, Plaintiff offers no explanation for why the untimeliness of those opinions is substantially justified.

### v. Summary of Exclusions and Limitations

To summarize, Luack's opinions are subject to the following limitations and exclusions: The Court will not consider Lauck's opinion that Krause was shot while inside his residence. Not only was this opinion untimely and excludable under Rule 37(c), Lauck is unqualified to make it. Lauck is no expert in ballistics and is unqualified to conduct bullet trajectory analysis. To the extent his opinions rely on that analysis, his conclusions regarding the physical locations and orientations of Krause and Selmanson are excluded. Further, the Court will exclude statements of legal conclusion identified in this Order. That said, in some arenas, Lauck's opinions are perfectly acceptable and are likely to assist the finder of fact. The Court finds Lauck generally qualified as a police practices and use of force expert. Insofar as his opinions draw from such experience, they are allowable. Specifically, Lauck's testimony regarding Defendants' alleged violation of MCSO policies and the appropriateness of their conduct in light of both those policies and accepted police

practices is permissible.

### b. Defense Animation, Drawings, and Expert's Opinion (Doc. 123)

Plaintiff moves to preclude Defendants' expert James Tavernetti from testifying at trial and to exclude his animations and drawings from consideration. (Mot. 1 at 1.) Chiefly a challenge to the accuracy of Tavernetti's animations, Plaintiff points to specific alleged inaccuracies as misleading. The Court addresses each below.

### i. Tavernetti's Qualifications

As a preliminary matter, Plaintiff does not dispute Tavernetti's qualifications. (*See* Resp. 1 at 2.) Plaintiff takes issue with *what* Tavernetti's animations depict, not his *expertise* to create them. The Court agrees with Defendants that Tavernetti's CV and expert report, (Doc. 123-1 at 10-13), establish his qualifications to generate the depictions at issue. *See* Fed. R. Evid. 702(a). Computer animations, like those here, are allowed in the Ninth Circuit. *See Friend v. Time Mfg. Co.*, No. 03-343-TUC-CKJ, 2006 WL 2135807, at *20 (D. Ariz. July 28, 2006) (citing *Byrd v. Guess*, 137 F.3d 1126 (9th Cir. 1998)). "At a minimum, the animation's proponent must show the computer simulation fairly and accurately depicts what it represents, whether the computer expert who prepared it or some other witness who is qualified to so testify, and the opposing party must be afforded an opportunity for cross-examination." *Id.* The Federal Rules of Evidence also endorse the use of animations. *See* Federal Rules of Evidence Manual § 403.02 (2018) ("In order to explain or prove how a disputed event occurred, a party may find it helpful to demonstrate the event in Court, or to provide a videotaped or even a computerized recreation of the event."). The standard for admission of computer animations is the same as for demonstrative evidence. *See Friend*, 2006 WL 2135807, at *20 ("The use of computer animations is allowed when it satisfies the usual foundational requirements for demonstrative evidence.").

Furthermore, the animations are relevant and draw directly from the factual record to recreate the scene of the shooting. Each specific depiction cites to record evidence to help the finder of fact understand the scene in the moments before, during, and immediately

after the incident. *See* Fed. R. Evid. 702; *Mukhtar*, 299 F.3d at 1066 n.7 ("Encompassed in the determination of whether an expert testimony is relevant is whether it is helpful to the jury, which is the 'central concern' of Rule 702."). For example, Tavernetti relied on autopsy measurements and photographs to locate the entrance and exit wounds, based the physical locations of Selmanson and Krause on deposition testimony, and provides detailed foundation for each animation by citing the record evidence relied upon. (*See e.g.*, Doc. 123-1 at 4, (identifying the specific autopsy measurements used to accurately depict wound locations and physical characteristics), 5-9 (specifically citing deposition testimony by page and line references that supports the depictions from Selmanson's first knock on Krause's door).) Plaintiff does not challenge Tavernetti's methodology, but instead argues the end product misleads. To the extent the parties contest the accuracy of the underlying data that supports Tavernetti's depictions, such weaknesses can be addressed through cross-examination and other expert testimony. But, as illustrative animations—rather than exact recreations—of the incident, the Court finds no sound basis to exclude the animations.

### ii. Plaintiff's Specific Arguments

Although the animations are both relevant and derived from reliable methodology, Plaintiff argues the depictions mislead in the following ways:

#### 1. Depiction of the Bullet Trajectory

Plaintiff first argues Tavernetti's animation are misleading because they show the bullet passing through Krause's right thigh at a downward angle, contradicting the medical examiner's testimony and autopsy report that the "bullet traveled upward through [Krause's] right thigh." (Mot. 1 at 6 (quoting Resp. 1, Ex. 1, "Mosely Depo." at 14:) This argument focuses on the deviating path of one of Selmanson's bullets. Setting aside the sequence in which the shots were fired, one of Selmanson's bullets travelled from the barrel of his service pistol on a slightly downward trajectory, entered Krause's penis and exited through his scrotum.[13] The bullet then entered Krause's right thigh, "but[,] then passing

---

[13] While the bullet, in the context of its impact with Krause's privates, is at times described as "traveling upward," Dr. Mosely clarified such comments were an "artifact of

through his thigh, it went upward." (Mosely Depo. at 58:9-10.) The bullet thus exited Krause's right thigh approximately ¼ inch higher than where it entered. (*See* Doc. 122-1, Ex. K, "Krause Autopsy" at 80, (measuring the entrance wound on the "anteromedial aspect of [the] proximal portion of the right thigh . . . is centered 38-1/2 inches below the top of the head" and finding the bullet "exits the body on the lateral aspect of the upper portion of the right thigh . . . situated 38-1/4 inches below the top of the head".). Recognizing that "nobody gets shot in the anatomic position," Dr. Mosely testified that a bullet's pathway can change from in this manner depending on how the physical position of the body and independent movement of limbs at the time of bullet impact. (*See e.g.,* Mosely Depo. at 59:1-22, 60:2-13.) As Defendants point out, this testimony, and the downward angle of Selmanson's shot, is also supported by Selmanson's account. Selmanson describes raising his weapon from the "low ready" to engage Krause. With service weapon initially "canted down at him," Selmanson testified that "started firing to come up." (Resp. 2, Ex. 2 at 81:20-25, 92:13, 24, 19-22; *see also* Mot. 1 at 7-8.)

Plaintiff points to nothing to rebut testimony that the bullet, once fired from Selmanson's weapon, traveled slightly downwards. Admittedly, either Tavernetti's depiction does not show the slight upward angle at which the bullet eventually traveled through Krause's right thigh or the difference is nonobvious. (*See* Krause Autopsy at 80.) That said, the Court finds that the downward path of the bullet's trajectory in Tavernetti's depiction is generally supported by the evidence. To the extent that it does not obviously depict the upward angle at which the bullet passed through Krause's right thigh, purported errors or inaccuracy can be sufficiently addressed through jury instruction and cross-examination. *See United States v. Walema*, 194 F.3d 1319 (9th Cir. 1999) ("[A]dmissibility of demonstrative evidence in particular is 'largely within the discretion of the trial judge.'") (quoting *United States v. Hernandez*, 109 F.3d 1450, 1452 (9th Cir. 1997)).

2. Decedent's Physical Location

Plaintiff's next argument—that the animations mislead by showing Krause outside

---

terminology" reflecting the orientation of Krause's penis at the time of impact. (*See* Mosely Depo. at 56:21-58:10 ("In the anatomic position, [the bullet] is going downward.").)

- 17 -

the residence when shot—turns on disputed interpretation of statements made by Schiller to Detective Slack of the Lake Havasu City Police Department shortly after the incident. (*See* Doc. 122-1 at 110.) As a threshold matter, Defendants correctly observe that Selmanson directly testified that Krause had stepped through the doorway and was outside the residence at the time of the shooting. (Resp. 1, Ex. 2, "Selmanson Dep." at 59:2-60:10, 61:16-63:21, 72:14-24, 74:25-75:4.) As for Schiller, both his deposition testimony and the interview transcript cited by Plaintiff, affirm he "never saw Mr. Krause from [his] angle until he was on the ground." (Resp. 1, Ex. 3, "Schiller Dep." at 68:1-3.) The deposition testimony of both deputies provides sufficient foundation for the animations' admission for demonstrative purposes. Insofar as Plaintiff wishes to challenge the consistency or reliability of the underlying facts supporting the depiction, such challenges may be addressed through cross-examination and other expert testimony.

### 3. Wound Sequence

Tavernetti's animations show Selmanson's shots in a specific sequence—the first bullet passing through Krause's right thigh, the second through Krause's abdomen, and the third missing Krause altogether. Plaintiff's bald assertion that no evidence exists to support the shots were fired in that order is incorrect. (*See* Resp. 1, Selmanson Dep. at 81:20-25, 82:13, 14, 19-22.) The firing sequence is based in admissible testimony which Plaintiff may later challenge.

### 4. Decedent's Forward Motion

Tavernetti's depiction of Plaintiff's movement as northward towards Selmanson is similarly supported by the Selmanson's deposition testimony. (Selmanson Dep. at 74:25-75:4.) Schiller's recollection that Krause was "east of the doorway" does not undermine animation such that it is misleadingly illustrative of Selmanson's account.

### 5. Depiction of Decedent's Right Hand and Trigger Finger

The animations show Krause's right hand on the outside aspect of the shotgun and, on closer examination, Krause's right finger in the trigger guard. This aspect of the depiction is unsupported by evidence in the record. (*See* Selmanson Dep. At 60:20-25)

Selmanson attested that Krause's hand was not observable from his perspective. (*Id.*) However, as Defendants suggest, this mistake is not material to Selmanson's justification for use of force. Cross-examination at trial provides opportunity for the parties' arguments over whether the animations' depiction of Krause's hand and finger are reasonable inferences from the record. (*See* Resp. 1 at 9.)

### 6. Respective Locations of Decedent and Selmanson

Plaintiff views the physical locations of Krause and Selmanson as an additional discrepancy requiring exclusion of Tavernetti's animations. The Court disagrees. Any minor divergence between the physical locations found in the animations and the locations marked by Selmanson during deposition are largely addressed by Selmanson's admission that the locations were not "exact" and based on his memory of the incident. (Selmanson Dep. At 34:1-9.) Further, Plaintiff's conclusory challenge ignores Tavernetti's explanation regarding how the locations were ascertained. (*See* Doc. 123-1 at 3-6.)

### 7. The Missing Floor Mat

Lastly, Plaintiff's threadbare claim that the absence of a floormat animation renders the animations unreliable fails. The Court can see no argument, nor does Plaintiff offer one, as to why the "floor mat is instrumental to determining the position of Decedent." (Mot. 1 at 15.)

### IV. CONCLUSION

Accordingly,

**IT IS ORDERED** DENYING Plaintiff's *Daubert* Motion to Preclude Defense Animation, Drawings & Expert's Opinions, (Doc. 123).

**IT IS FURTHER ORDERED** GRANTING, in part, Defendants *Daubert* Motion Re: David M. Lauck, (Doc. 129), and excluding Plaintiff's expert testimony in a manner consistent with this Order.

Dated this 7th day of May, 2020.

_____
Honorable Susan M. Brnovich
United States District Judge