**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ryan Andrew Krause, et al., | No. CV-17-08185-PCT-SMB |
| Plaintiffs, | **ORDER** |
| v. | |
| County of Mohave, et al., | |
| Defendants. | |

Pending before the Court are the parties' cross-motions for summary judgment. Plaintiff Ryan Andrew Krause, on behalf of Decedent Drey Krause, moved for partial summary judgment, (Doc. 121, "MPSJ"), on their excessive force claim on December 6, 2019.   Defendants later moved for summary judgment as to all claims, (Doc. 139, "DMSJ"), on December 20, 2019.  Responses and replies followed both motions.[1]  Neither party requested oral argument.  Considering the parties' motions, well-developed factual record, and relevant case law, the Court enters the following Order:

## I.      BACKGROUND
### a.  Procedural Background

On October 10, 2018, Ryan Andrew Krause, individually and on behalf of all statutory beneficiaries of Decedent, Drey Gerald Krause, filed a Second Amended

---

[1] The filings included responsive motions and statements of fact. (Doc. 135, "MPSJ Resp."; Doc. 145, "MPSJ Repl."; Doc. 122, "PSOF"; Doc. 127, "DSOF"; Doc. 143, "PCSOF"; Doc. 144, "PSSOF"; Doc. 136, "Def. Resp. to PSOF"; Doc. 142, "DMSJ Resp.", Doc. 147, "DMSJ Reply".)

Complaint[2] against the County of Mohave; Mohave County Sheriff Douglass Lee Schuster and his wife, Cynthia Schuster, Jordan Selmanson and his wife, Ashley Link Selmanson, and Richard Schiller and his wife, Kathleen Ann Schiller.  (Doc. 49, "SAC".)  The SAC alleges the following: (1) use of excessive and deadly force in violation of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against Selmanson; (2) failure to provide medical care in violation of the Fourth, Eighth, and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against Selmanson and Schiller; (3) failure to train under 42 U.S.C. § 1983 against Schuster and Mohave County; (4) *Monell* violations under 42 U.S.C. § 1983; (5) wrongful death and negligence against Selmanson; and (6) wrongful death and battery against Selmanson.  (*Id.*)

### b.  Factual Background

#### i.  Arrival on Scene

The Court sets forth the material facts below.  Unless otherwise indicated, the following facts are uncontroverted.

At approximately 7:14 p.m. on February 13, 2017, two Mohave County Sherriff's Office ("MCSO") Deputies responded to the 911 call of Ms. Shanna Farris.  Earlier that evening, while outside her trailer in Topock, Arizona, Farris heard a male voice coming from the direction of the neighboring Krause residence.  (PSOF ⁋ 4 ; DSOF ⁋ 2; PCSOF ⁋ 2.)  Shortly thereafter, what Farris believed to be a gunshot fired from the same location, impacted the gravel driveway not far behind her.  (PSOF ⁋ ; DSOF ⁋ 5.)  Farris called 911 from a neighbor's house across the street.  (DSOF ⁋ 7.)  Approximately twenty-six minutes after that call, MCSO deputies Jordan Selmanson, and Richard Schiller arrived at the scene separately.  (DSOF ⁋ 8.)  Having reviewed the contents of Farris' 911 call prior to arrival, Selmanson stopped to take Farris' report.  (DSOF ⁋ 10.)  Schiller continued onward, parking his patrol car in front of the Krause residence.  (*Id.*)

#### ii.  The Deputies' Approach

After taking the reports of nearby residents, Selmanson joined Schiller outside the

---

[2] Decedent's mother, Sharline Krause, who initiated the action on September 14, 2017, (*See* Doc. 1), was later substituted for Ryan Krause. (Doc. 38.)

Krause property.  (DSOF ⁋ 12.)  The deputies approached the Krause residence, a trailer with a detached garage and covered carport, together. (DSOF ⁋13.)  They walked up a driveway that ran alongside Krause's trailer, underneath the covered carport that extended from the trailer itself and terminated in a garage.  (*See* PSOF ⁋ 8; DSOF ⁋ 13.)  Inside the trailer, but unbeknownst to the deputies, was Drey Krause and his mother.  (Doc. 127-1 at 36:3-14.)  The deputies approached the trailer together then separated, taking different positions near the entryway.  (DSOF ⁋⁋ 12-14.)  Selmanson approached the main door. (DSOF ⁋⁋ 12-13.)  Schiller passed that door to investigate a sliding glass door located farther south along the trailer's exterior wall.  (DSOF ⁋ 14.)  At the main door, Selmanson knocked and announced: "Sheriff's office."  (DSOF ⁋ 15.)  There was no answer.  (*Id.*) He knocked and announced a second time, backing away from the door immediately thereafter.  (DSOF ⁋ 16.)  Above the door, the porch light lit up.  (DSOF ⁋ 17.)  Staring at the now well-lit closed door, Selmanson heard what sounded like someone "fiddling" with the lock.  (DSOF ⁋ 17.)

### iii.  "Shots Fired, Send Medical"

What happened next, happened quickly.  (*See* PSOF ⁋ 9.)  The door began to open. (DSOF ⁋ 18.)  A shotgun barrel protruded from the doorway.  (*Id.*)  The open door revealed a man, Drey Krause, standing in the doorway. He held a shotgun on his right side, his right hand gripping the receiver.  Seeing the shotgun, Selmanson, at least twice, ordered Krause to "drop the gun" or "put the gun down" as he continued is backward retreat.  (*Id.* ⁋ 24.) The commands were loud and clear—Schiller, Ms. Farris, and nearby neighbors all heard them.  (*Id.* ⁋⁋ 25-26.)  The parties dispute how the next moments unfolded.[3]  According to Selmanson, Krause stepped through the doorway and, with shotgun in hand, reached across his body with his left hand and grabbed the foregrip of the shotgun.  (*Id.* ⁋ 21.)  Now holding the shotgun with both hands, Krause approached Selmanson.  (*Id.* ⁋ 22.)  As he continued retreating backward, Selmanson repeated his earlier orders.  (*Id.* ⁋ 27.)  "Drop

---

[3] The parties dispute the direction that Krause pointed the shotgun when he raised the barrel, (PSOF ⁋ 18; DSOF ⁋ 27), Krause's physical location and movement leading up to the shooting, (DSOF ⁋⁋ 21-23; PCSOF ⁋28), and whether Krause was facing Selmanson when shot. (DSOF ⁋ 28, PCSOF ⁋ 28.)

the gun." (*Id.* ¶ 24.)  Krause did not respond, but instead continued his advance towards Selmanson and began to raise the shotgun barrel to ninety degrees.  With the shotgun barrel pointed at him, Selmanson reacted.  (*Id.* ¶ 27.)  He quickly fired three shots.  (PSOF ¶ 20; DSOF ¶ 27.)  Two found their mark and Krause collapsed to the ground, dropping his shotgun.  (DSOF ¶ 29.)  The third bullet missed and lodged itself about five feet, three inches above the ground in the north-facing wall of the garage.  (Doc. 127-2 at 8.)  From the moment the porch light flicked on, "mere seconds" had passed.  (PSOF ¶ 9; Doc. 127-1, Ex. 5 at 135:11-136:10; Doc. 136, Ex. 2 at 62:7-63:16.)

### iv.  The Aftermath and Medical Treatment

The deputies handcuffed the fallen Krause and Selmanson radioed, "shots fired[,] send medical" at 7:19 p.m., roughly one minute after the incident.  (DSOF ¶¶ 35-36.)  The deputies later testified that they observed no visible injuries, bleeding, or markings on Krause's shirt, but, hesitant to aggravate any injuries, they decided to wait for medical assistance rather than attempt emergency care.  (DSOF ¶¶ 38-39; PCSOF ¶¶ 38-39.)  Receiving a radio call informing Selmanson to contact his supervisor, Selmanson left Krause with Schiller, walked down the driveway, and called his Sergeant, Larry Matthews. Selmanson ended the call as Golden Shores Fire Department arrived on scene at 7:28 p.m., approximately eight minutes after the shooting.  (DSOF ¶ 41.)  The medical personnel transported Krause to Valley View Medical Center where he was pronounced dead shortly after arrival.  (DSOF ¶ 42.)

### v.  The Crime Scene, Bullet Trajectories and Autopsy

The medical examiner's report indicated that two bullets wounded Krause.  Setting aside the sequence in which the shots were fired, one of Selmanson's bullets travelled from the barrel of his service pistol on a slightly downward trajectory, entered Krause's penis and exited through his scrotum.[4]  The bullet then entered Krause's right thigh, "but[,] then passing through his thigh, it went upward."  (Mosely Depo. at 58:9-10.)  The bullet thus

---

[4] While the bullet, in the context of its impact with Krause's privates, is at times described as "traveling upward," Dr. Mosely clarified such comments were an "artifact of terminology" reflecting the orientation of Krause's penis at the time of impact. (*See* Mosely Depo. at 56:21-58:10 ("In the anatomic position, [the bullet] is going downward.").)

exited Krause's right thigh approximately ¼ inch higher than where it entered.  (*See* Doc. 122-1, Ex. K, "Krause Autopsy" at 80, (measuring the entrance wound on the "anteromedial aspect of [the] proximal portion of the right thigh . . . is centered 38-1/2 inches below the top of the head" and finding the bullet "exits the body on the lateral aspect of the upper portion of the right thigh . . . situated 38-1/4 inches below the top of the head".) The second bullet penetrated the left side of Krause's abdomen but, terminating "in the right psoas muscle," did not exit.  (DSOF ⁋43; Krause Autopsy at 84.)  The 5'8" Krause weighed one-hundred-sixty-eight pounds and had a blood alcohol content (BAC) of 0.271. (PSOF ⁋ 22; DSOF ⁋ 44.)

### vi.  The Deputies' Training and Shooting Investigations

Although the incident marked the first occasion Selmanson had fired his service weapon in the field, (DSOF ⁋ 52), Selmanson was trained.  He received initial firearms training from Western Arizona Law Enforcement and additional firearms instruction from the MCSO.  (DSOF ⁋ 49.)  The deputies were also certified by Arizona's Peace Officer Standards and Training ("POST"), (DSOF ⁋50), and were familiar with operative MCSO policies regarding use of lethal force and rendering of medical aid.[5]  (DSOF ⁋⁋ 45-48.) Following the incident, the MCSO conducted a full use of force investigation that eventually cleared Selmanson, finding he used lethal force in self-defense.  (DSOF ⁋⁋ 53-54.)  Selmanson and Schiller were each interviewed at least twice—first by Detective Cindy Slack of the Lake Havasu City Police Department a few days after the incident, and later in depositions for the instant civil proceedings.

## II.   LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is any factual issue that might affect the outcome of the case under

---

[5] In part, the use of force policy states: "[a] deputy may use deadly force to protect him/herself or others from what he/she reasonably believes would be an imminent threat of death or serious bodily injury." (DSOF ⁋ 46.)

the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). The court need only consider the cited materials, but it may also consider any other materials in the record. *Id.* 56(c)(3). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 1056 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Id.* at 323–24.

Initially, the movant bears the burden of demonstrating to the Court the basis for the motion and "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. If the movant fails to carry its initial burden, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). If the movant meets its initial responsibility, the burden then shifts to the nonmovant to establish the existence of a genuine issue of material fact. *Id*. at 1103. The nonmovant need not establish a material issue of fact conclusively in its favor, but it "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 247–48, 106 S.Ct. 2505. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted). However, in the summary judgment

1    context, the Court believes the nonmovant's evidence, *id.* at 255, and construes all disputed

2    facts in the light most favorable to the nonmoving party, *Ellison v. Robertson*, 357 F.3d

3    1072, 1075 (9th Cir. 2004).  If "the evidence yields conflicting inferences [regarding

4    material facts], summary judgment is improper, and the action must proceed to trial."

5    *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002).

7    **III.    DISCUSSION**

8    **a.  Count I: Excessive Force Claim**

9    Plaintiff claims that Selmanson's use of deadly force violated decedent's rights

10    under the Fourth Amendment.[6]

11    **i.  Fourth Amendment Standard**

12    A claim that law enforcement officers used excessive or deadly force is examined

13    under the Fourth Amendment and its "reasonableness" standard. the objective

14    reasonableness standard.  *Graham v. Connor*, 490 U.S. 389, 395, 109 S.Ct. 1865, 104

15    L.Ed.2d 443 (1989).  As the "touchstone" of Fourth Amendment analysis, "reasonableness

16    is generally assessed by carefully weighing 'the nature and quality of the intrusion on the

17    individual's Fourth Amendment interests against the importance of the governmental

18    interests alleged to justify the intrusion.'"  *Cnty. of Los Angeles, Calif. v. Mendez*, 137

19    S.Ct. 1539, 1546, 198 L.Ed.2d 52, 85 USLW 4292 (2019).  In this balancing, courts pay

---

[6] Plaintiff's "excessive force" claim under the Fourteenth Amendment will be dismissed with prejudice.  *See Graham v. Connor*, 490 U.S. at 395 (holding that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach").  To the extent that Plaintiff's Fourteenth Amendment excessive force claim can be construed as a familial associations claim, Plaintiff does little to flesh out the argument.  Based on facts not in dispute, the Court finds that Selmanson lacked sufficient opportunity to deliberate required in familial association claims.  *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 797-98 (9th Cir. 2014) ("Where, as here, the officers did not have time to deliberate, a use of force shocks the conscience only if the officers had a "purpose to harm" the decedent for reasons unrelated to legitimate law enforcement objectives."); *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (holding that familial association claims requires a plaintiff to prove that the officers' use of force "shock[ed] the conscience.").  Aside from a smattering of case law establishing that familial association claims exist, Plaintiff presents no evidence Selmanson acted for any reason other than self-defense.  Accordingly, any such claim must fail.

"careful attention to the facts and circumstances of a particular case," *Graham*, 490 U.S. at 396, 109 S.Ct. 1865, and ask whether the totality of the circumstances justifies a particular sort of search or seizure. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Courts thus recognize that "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. An objective inquiry, the reasonableness of a use of force is gauged by "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

The Ninth Circuit has set forth a three-part test to determine whether a Fourth Amendment violation has occurred. *Espinosa v. City and Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010). First, the Court assesses the severity of the intrusion by evaluating the type and amount of force inflicted. *Id.* (citing *Miller v. Clark Cnty*, 340 F.3d 959, 964 (9th Cir. 2003)). Second, the Court evaluates the government's interest by assessing the severity of the crime, whether the suspect posed an immediate threat to the officer's or public's safety, and whether the suspect was resisting arrest or attempting to escape. *Id.* (citing *Miller*, 340 F.3d at 964; *Graham*, 490 U.S. at 396). Third, the Court balances the gravity of the intrusion against the government's need for the intrusion. *Id.* (quoting citing *Miller*, 340 F.3d at 964). The inquiry ultimately aims at determining whether the force used was "greater than [was] reasonable in the circumstances." *Id.* (quoting *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002).

At the summary judgment stage, once the Court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether an officer's actions were objectively reasonable under

the Fourth Amendment is "a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).  An officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force. *Smith v. City of Hemet*, 394 F.3d 698, 701 (9th Cir. 2005).  Because the excessive force inquiry is "inherently fact specific, the determination of whether the force used . . . was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and Cnty. of S.F.*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotations omitted). As a general matter, "summary judgment should only be granted 'sparingly' because such cases often turn on credibility determinations by a jury." *Espinosa*, 598 F.3d at 537 (quoting *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003)).

### 1.  Parties' Arguments

To Defendants, the case is simple.  Faced with life or death situation, Selmanson reasonably used deadly force.  Any quibbling over the exact physical location or body position of Krause and the deputies or the disputes over the possibility that less-than-lethal methods may have diffused the situation cannot distract from the fact that Selmanson was justified in meeting Krause's threatened deadly force with an equally lethal response.

Plaintiff, on the other hand, alleges malfeasance.  At various points, Plaintiff accuses Defendants of lying, willful blindness, and changing their stories to fit the evidence. Taking serious issue with Defendants' presentation of the incident on both factual and legal grounds, Plaintiff argues material discrepancies exist between Selmanson's account of the shooting to Detective Slack three days after the incident and the record evidence. Pointing to Schiller's interview with Detective Slack and expert opinions[7], Plaintiff paints Selmanson's account as not credible.  In doing so, Plaintiff focuses on several disputed facts.  Foremost among these, and in contrast to Defendants' rendition, Plaintiff believes Krause was shot while standing inside the trailer and only crossed the threshold when he fell to the ground outside after being shot.  According to Plaintiff, Krause never approached

---

[7] A large swath of Lauck's opinions have been properly excluded as explained in this Court's ruling on the parties' respective *Daubert* motions. (*See* Doc. 150.)

Selmanson and, while he did raise his shotgun, he never pointed it at the deputy.  Painting Selmanson's conduct as egregiously endangering the lives of others, and with little justification for killing the inebriated Krause, Plaintiff argues the use of force objectively unreasonable.

Below, the Court analyzes the central facts in dispute, then assesses the reasonableness of the deputies' conduct.

### a.  A Sham Affidavit?

As a preliminary matter, the Court does not accept Plaintiff's invitation to exclude Selmanson's testimony under the sham affidavit rule.  (*See* MPSJ at 14.)  A review of the inconsistencies between Selmanson's February 27, 2017 interview and his later deposition that Plaintiff believes justifies throwing out Selmanson's deposition testimony altogether does not reveal material changes.  Although the accounts occasionally differ on the margins, they are otherwise largely consistent retellings of Selmanson's impressions of the tense moments before the shooting.  And as Defendants observe, the sham affidavit rule does not apply in the circumstances.  *Van Asdale v. International Game Technology*, 577 F.3d 989, 998 (9th Cir. 2009) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony).  Further, the rule's application is particularly dubious at the summary judgment stage "because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment." *Id.* (determining the rule "should be applied with caution") (quoting *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993)).

### b.  Disputed Facts

Before assessing the reasonableness of Selmanson's conduct, the Court examines the key facts in dispute.[8]  Plaintiff raises a number of factual disagreements, whether his assertions are supported with materials in the record that establish a dispute such that a reasonable jury could return a verdict in Plaintiff's favor is another story.  In examining

---

[8] The identified factual disputes are non-exhaustive. Plaintiff disputes a litany of other facts that are either irrelevant, semantic, or unhelpful. (*See e.g.,* PCSOF ⁋ 26 (parsing whether Krause's neighbors had "several" or "only one lot" between themselves and the Krause residence), ⁋ 30 (distinguishing the sound of a "rap" from a "knock" on one's door).)

the following disputes, the Court is careful not to indulge in credibility determinations, recognizing excessive force determinations should only rarely be taken from a jury. *See Green*, 751 F.3d at 1049.

### i.  Was Krause Facing Selmanson?

Plaintiff disputes that Krause was facing Selmanson when the shots were fired. (MPSJ at 18-19.)  Because the autopsy report indicates that bullets entered Krause's left side, Plaintiff argues that it's "common sense . . . that if someone is facing you, bullets do not enter them from the left side."  (Doc. 145 at 13.)  Plaintiff's certainty is misplaced— the autopsy report in no way rebuts or contradicts Selmanson's testimony.  (*See* Doc. 127-1 at 72:13-15 ("I can't s, 74:21-75:4 ("I guess his head was towards me, his body was facing out . . . canted towards me slightly.")[9]  The remaining support for Plaintiff's argument improperly relies on conclusions based on the bullet trajectory analysis of his expert, David M. Lauck.  As discussed in this Court's order on the parties' *Daubert* motions, Lauck is unqualified to conduct that analysis and, regardless, his opinions are untimely and properly excluded.  (*See* Doc. 150.)

### ii.  Krause's Physical Location and Movement

Plaintiff repeatedly emphasizes that Krause was inside the trailer when shot.[10] (MPSJ) This argument fails to raise a genuine dispute of a material fact. First, Selamanson's recollection both in his interview with LHPD Detective Slack and subsequent deposition directly contradicts that characterization. (Doc. 127 ¶¶ 21-22; Doc. 122-1, Ex. G at 19, 21.)  Second, the physical evidence is consistent with Selmanson's

---

[9] Plaintiff imposes a degree of exactitude that Selmanson explicitly refused to adopt:

> Q. Now, did the two of you maintain the same angle as you were stepping backwards and Mr. Krause was approaching you?
>
> A. I can't say with definity [sic] that that was the case. As I said, I was looking at the barrel, not where his nose was facing or his face, I should say . . . [b]ut as he stepped out, he's facing me. His face is looking at me."

Doc. 127-1 at 72:13-18.

[10] As with disputes over the direction Krause faced when shot, Plaintiff attempts to bolster this theory that Krause was inside the trailer with the excluded opinions of expert David Lauck.

account.   It is undisputed that Krause dropped his shotgun several feet outside the residence.  (*See* Doc. 122 ⁋ 47.)   Third, Schiller's deposition testimony rebuts Plaintiff's conclusion.  (*See* Doc. 127-1, Ex. 6 at 43:4-25; Doc. 136, Ex. 2 at 68: 1-3.)  Far from "unequivocally demonstrate[ing] that [Krause] was inside his residence," the evidence, viewed in the light most favorable to Plaintiff, does not contradict Selmanson's testimony.

*iii.   The Orientation of Krause's Shotgun*

The parties dispute the direction Krause pointed the shotgun when he raised the barrel.  (PSOF ⁋ 18; DSOF ⁋ 27).   Selmanson testified that when he fired, the barrel of Krause's shotgun was "pointed at me."   (DSOF ⁋ 27.)    Plaintiff disputes this characterization for two reasons.   First, rather than offering conflicting evidence, Plaintiff points to an earlier moment from the same deposition where Selmanson stated that he started "firing to come up" from a low-ready position "as [Krause] starts to raise the barrel." (Selmanson Dep. 82:11-15.)  These two actions are not inconsistent—Krause could easily raise his shotgun *and* point it at Selmanson.  That, of course, is the most obvious reading. Even viewing the testimony in a light most favorable to Plaintiff, there is no contradiction. Second, Plaintiff argues Selmanson's testimony is critically inconsistent.  That is, Plaintiff contends that "[i]f Decedent had been pointing the firearm at Selmanson, Selmanson would have been able to see Decedent's right-hand fingers."  (MPSJ at 18.)  But this speculative conclusion is "not supported by sufficient facts to validate it in the eyes of the law" nor does it contradict Selmanson's testimony.  *Brook Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 238, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).

Plaintiff's arguments do not "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. That said, the parties' view of the shooting is undoubtedly different, but not materially so. Selmanson and, to some extent, Schiller, are the only witnesses able to testify as to the events that led to Krause's death.  Accordingly, the Court must carefully examine the evidence in the record to determine whether the officers' testimony is internally consistent and consistent with other known facts. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 790

(9th Cir. 2014).  As discussed below, the Court finds the undisputed facts support the grant of summary judgment and that any inconsistencies between the deputies' respective testimonies are only ancillary to holding that Selmanson's actions were objectively reasonable.  It is undisputed that Krause answered the door holding a shotgun, refused to put the gun down when ordered by Selmanson, and instead gripped the gun with both hands and raised it to ninety degrees.

### 2.  Objective Reasonableness Inquiry

#### a.  Nature of the Force Inflicted

##### i.  Deadly Force

The Court first evaluates "the type and amount of force inflicted."  *Espinosa*, 598 F.3d 537 (quotation omitted); *see also Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994) (observing that the *Graham* factors "are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure").  There is no question that Selmanson employed deadly force.  Since Selmanson intruded on the highest level of Fourth Amendment interests in using deadly force, the question is whether the intrusion was justified by the countervailing governmental interests at stake.

##### ii.  Alternative Methods

The Court may also consider whether alternative methods were available to subdue Krause.  *See Chew v. Gates*, 27 F.3d 1432, 1440 n.5 (9th Cir. 1994).  Plaintiff argues that the deputies' tactical decisions in (1) approaching the residence and (2) responding to Krause were inflammatory.  In the former category, Plaintiff argues that Selmanson "provoked the violent confrontation" by choosing to approach the door rather than "surround and call-out."  (MPSJ at 16.)  Perhaps with today's knowledge of the outcome, the deputies might approach the Krause residence differently.  Further, experts may opine on the likelihood that employing other tactics would have allowed the deputies to deescalate the threat without use of deadly force, but that type of retrospective analysis is beyond the province of this Court's objective reasonableness analysis.  *Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). The Court cannot say that the deputies acted unreasonably by walking to the door, knocking on it, identifying themselves as law enforcement, and backing away. This is not a case where the deputies created the very emergency that called for lethal force, (*contra* MPSJ at 16), but rather, reacted to a situation thrust upon them.

Second, Plaintiff argues that Selmanson could have taken a "couple of big steps" back towards cover rather than engaged. (MPSJ at 22.) Plaintiff points to no authority that establishes Selmanson's duty to retreat when faced with a perceived lethal threat. Even assuming that such retreat was possible, the availability of that less-intrusive alternative by itself, does not render the deputies conduct unreasonable. *Wilkinson v. Torres*, 610 F.,3d 546, 551 (9th Cir. 2010) (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). That is because "the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them." *Henrich*, 39 F.3d at 915 (citing *Illinois v. Lafayette*, 462 U.S. 640, 647, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) and *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-557 n. 12, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)). Regardless of whether employing less-intrusive methods (like a TASER, pepper spray or physical disarmament) or other de-escalation tactics was even appropriate, (*see* DSOF ⁋ 56), Plaintiff's suggested analysis requires the Court to indulge in an *ex post* inquiry that directly contravenes the principles guiding the objective reasonableness inquiry. Requiring the deputies, with the benefit of hindsight, to have chosen a less intrusive alternative would "require them to exercise superhuman judgment." *Henrich*, 39 F.3d at 915. That is something this Court will not (and cannot) require.

b. Governmental Interests

To assess the governmental interests at stake, the Court first examines the severity of the crime at issue. *Espinosa*, 598 F.3d at 537. The deputies approached the Krause residence to investigate the possibility that someone within discharged a firearm in the direction of a neighbor. Taking the facts as true, Krause likely committed additional crimes in the moments before the shooting. That Krause failed to obey, or even respond, to

Selmanson's lawful orders is undisputed.  Krause opened the door holding the shotgun in his right hand, and despite Selmanson's orders, proceeded to grip it with both hands, and raise it to ninety degrees.  Selmanson consistently reiterated the shotgun was pointed at him.  Even construing the evidence in Plaintiff's favor, Krause's actions constituted "attempted or completed dangerous felonies under Arizona law."  *See e.g.,* A.R.S. §§ 13-202 (threatening or intimidating); 13-1203 (assault); 13-1204 (aggravated assault with a deadly weapon); 13-2508 (resisting arrest); 13-1105(3) (attempted murder of a police officer).  This factor weighs in Defendants' favor.

The second *Graham* factor requires inquiry into whether Krause posed an immediate threat to the deputies or the public's safety.  *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011).  In weighing the immediacy of an alleged threat, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such concern."  *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010) (citation and quotation marks omitted).  Here, both are present.  Selmanson acted to neutralize a perceived threat to his life—he faced an armed suspect who failed to obey lawful commands.  By raising his shotgun barrel to a ninety-degree angle and pointing it at Selmanson, Krause created an immediate threat to deputy's life.  *Smith*, 394 F.3d at 704 ("where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force").[11]  This second, "most important" factor in the governmental interest inquiry heavily weighs in Defendants' favor.  *Mattos*, 661 F.3d at 441 (quoting *Smith*, 394 F.3d at 702).

The third *Graham* factor asks whether Krause actively resisted arrest or attempted to evade arrest by flight.  *Graham*, 490 U.S. at 396.  Krause's actions again weigh in favor of Defendants here.  At least twice, Selmanson ordered Krause to drop his weapon.[12]  On

---

[11] Even assuming Krause did not point the shotgun barrel *directly* at Selmanson as Plaintiff contends, Krause's aggressive actions created an immediate threat to the deputy's life. *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) ("If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat.").

[12] Krause's neighbors' recall hearing Selmanson issue his orders two or three times. Selmanson remembered ordering Krause to drop his weapon on five or six occasions. (Doc. 127-1, Ex. 5, "Selmanson Dep." At 75:11-76:13.)

- 15 -

neither occasion did he comply.  Then he raised his weapon.  Plaintiff invites the Court to ignore Krause's actions and, instead, assume Krause was raising the shotgun to place it on the ground.  Alternatively, Plaintiff imagines that Krause was too drunk to obey commands—with his faculties so diminished, he required more time to comply with Selmanson's orders and his actions can not be reasonably interpreted as resisting arrest. (*See* Doc. 143 ⫢ 27.)  Admittedly, the incident unfurled rapidly, and Krause was, indeed, extremely inebriated.  (PSOF ⫢ 22; DSOF ⫢ 44.)  But drunkenness is no excuse for noncompliance and Plaintiff's unsupported speculation has no home in this inquiry.  This factor also weighs in Defendants' favor.

### c.  Necessity of Force

Lastly, the Court must balance the use of force with the need for such force to determine whether the force used was "greater than reasonable under the circumstances." *Espinosa*, 598 F.3d 537 (quoting *Santos*, 287 F.3d at 854).  Included in this "pure question of law" is whether a suspect's actions have risen to the level warranting deadly force." *Scott*, 550 U.S. at 381 n.8, 127 S.Ct. 1769.  Judged from the perspective of a reasonable officer on the scene, *Graham*, 490 U.S. at 396-97, the Court finds Selmanson's use of deadly force reasonable in the circumstances.

Selmanson approached the trailer, knocked and announced himself as a law enforcement officer.  He did so twice.  Immediately thereafter, he was met with an adult male holding a shotgun.  At least twice and so loud the neighbors heard it clearly, Selmanson ordered Krause to drop his weapon.  *See Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997) (determining that officers must give warnings "whenever practicable").  Krause did not respond or comply.  According to Selmanson, Krause stepped out of the trailer and, now holding the shotgun with both hands, began to raise it towards him.  Selmanson fired three shots, two hitting Krause.[13]

---

[13] That Selmanson's third shot may have endangered Schiller's life does not bear on the reasonableness of Selmanson's application of force against Krause in this instance. While other factual scenarios may caution against an officer's use of deadly force where such force obviously endangers the lives of others, the facts here do not support that conclusion. Schiller was not in the line of fire at first knock. As the incident unfolded, all parties were in motion; Schiller changed direction at least twice. (*See* Doc. 127-1 at 59:19-60:4.) That

The result may be tragic, but the Court cannot say that Selmanson's reaction was unreasonable.[14]  *Gonzalez*, 747 F.3d at 800 ("The law does not require an officer who immediately faces physical harm to wait before defending himself until the indication of impending harm ripens into the onslaught of actual physical injury.") (Trott, J., dissenting). Selmanson was not constitutionally required to retreat in the face of deadly force.  (*Contra* MPSJ at 17-18); *see also Glenn v. Washington County*, 673 F.3d 864, 876 (9th Cir. 2011); *Watkins v. City of San Jose*, No. 15-CV-05786-LHK, 2017 WL 1739159, at *11 (N.D. Cal. May 4, 2017) (citing *Reed v. Hoy*, 909 F.2d 324, 331 (9th Cir. 1989), *overruled on other grounds by Virginia v. Moore*, 553 U.S. 164, 175, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008)). He was not required to attempt to disarm a suspect when threatened with deadly force.  *See Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994).  Nor was he close to equally culpable for creating this dangerous situation.  *Espinosa*, 598 F.3d at 537 (quoting *Scott*, 550 U.S. at 384) (holding that courts may "consider the parties' "'relative culpability' *i.e.*, which party created the dangerous situation and which party is more innocent").  Krause answered his door holding his shotgun.  Selmanson drew his service weapon in response.  (Doc. 127-1 at 61:2-5.)  Krause's noncompliance increased tensions. Krause's lifting his shotgun ripened a deadly threat.  With hindsight, the deputies might approach the situation differently, but from first knock, the deputies' actions were responsive and Krause's escalatory.  Officers, like Selmanson, must react instantaneously in "tense, uncertain, and rapidly evolving" situations.  *Graham*, 490 U.S. at 396.  Viewing the facts in a light most favorable to Plaintiff, and without making credibility determinations, the Court concludes that Selmanson's actions when faced with the rapidly escalating threat of deadly force was objectively reasonable.[15]

---

Selmanson did not shoot a tight grouping does not render his actions objectively unreasonable.

[14] Selmanson's actions also complied with MCSO policies on the application of deadly force.  *See* Doc. 127-2 at 98, "MCSO 300.5" ("A deputy may use deadly force to protect him/herself or others from what he/she reasonably believes would be an imminent threat of death or serious bodily injury. . . .An imminent danger may exist even if the suspect is not at that very moment pointing a weapon at someone.").

[15] Further, Plaintiff's factual disagreements do not alter this conclusion. Krause's exact physical location—whether standing in an open doorway or advancing towards Selmanson just outside—is immaterial to the threat he posed. In either instance, Krause's threat to the

## ii.  Qualified Immunity

Regardless of whether the Court determines he used excessive force, Selmanson argues he is entitled to qualified immunity given he faced a "threat of serious physical harm." (DMSJ at 10.)  As explained below, the Court agrees. *See Saucier v. Katz*, 533 U.S 194, 208, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

"Qualified immunity attaches when the official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (quoting *White v. Pauley*, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) (per curiam)).   The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (citation and quotation marks omitted). Qualified immunity thus "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).   The protection of qualified immunity applies regardless of whether the government's official error is a mistake of law, a mistake of fact, or a mistake based on a mixed question of law or fact." *Pearson*, 555 U.S. at 231, 129 S.Ct. 808.  "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam)).   The key question is whether the officer "had an objectively reasonable basis for believing that [Krause] posed a threat of serious physical harm, either to . . . himself or to others." *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (citing *Ryburn v. Huff*, 565 U.S. 469, 474, 132 S.Ct. 987, 181 L.Ed.2d 966 (2012) (per curiam).

deputy's life was manifest. Krause's failure to follow lawful orders and drop the weapon inflamed that situation. Raising his shotgun, Krause's threat became immediate. Ninth Circuit law does not support that an officer threatened with deadly force must wait to peer down a suspect's barrel before neutralizing the threat. *See Smith*, 394 F.3d at 704-05.

To overcome an officer's assertion of qualified immunity, a plaintiff must show that two prongs are satisfied: (1) the official's actions violated a constitutional right; and (2) the right was "clearly established" at the time of the officer's conduct. *Nelson v. City of Davis*, 685 F.3d 867, 875 (9th Cir. 2012) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).[16]

### 1. Violation of a Constitutional Right

As established above, because Selmanson acted objectively reasonably in response to Krause's threat of deadly force, there was no violation of a constitutional right. *Nelson*, 685 F.3d at 878 ("A seizure results in a constitutional violation only if it is unreasonable.") (citing *Graham*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

### 2. Clearly Established at the Time of Violation

Plaintiff also fails to satisfy the second prong. The second step of the qualified immunity inquiry asks whether Krause's right to be free from use of excessive force was clearly established at the time of the shooting. In making that determination, courts do not define the right at issue at a high level of generality. *See Kisela v. Hughes*, 138 S.Ct. at 1152; *Orn*, 949 F.3d at 1178. Respecting that qualified immunity "is designed to ensure that officers receive fair notice of the illegality of their conduct," courts recognize that general standards do not reliably provide such notice in excessive force cases, where the result turns on the facts of each case. *Orn*, 949 F.3d at 1178 (citing *Kisela*, 138 S.Ct. at 1153). Instead, courts look at whether controlling case law "squarely governs the specific facts at issue," *City of Escondido v. Emmons*, 139 S.Ct. 500, 503-504 (2019) (per curiam), such that alleged unlawfulness is "apparent" in "light of preexisting law." *Anderson v. Creighton*, 483 U.S. 634, 640 (1987). In "obvious cases" the general standards outlined in *Garner* and *Graham* suffice to put an officer on notice that his conduct is unlawful, *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S.Ct. 596, (2004), "but usually uncertainty

---

[16] Whether a constitutional right was violated is question of fact. *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 (9th Cir. 2009). The clearly established inquiry, on the other hand, is a question of law that only a judge can decide. *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017).

will remain as to whether the particular set of facts confronting the officer satisfies those standards." *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020).  In the latter case, an officer is "entitled to qualified immunity unless existing precedent . . . renders the unlawfulness of his conduct beyond debate." *Id.*

The question is what Selmanson reasonably understood his powers and responsibilities to be, when he acted, under clearly established standards. *Saucier*, 533 U.S at 208, 121 S.Ct. 2151.  Plaintiff believes Selmanson's conduct unlawful by clearly established standards in two respects.  Even taking Plaintiff's factual assertions at face value, the Court disagrees.

Plaintiff maintains that Selmanson shot Krause when: (1) Krause was "in his own home, not facing Selmanson," and; (2) "failed to warn [Krause] that he would be shot if he either turned or failed to drop the gun."  (MPSJ at 22.)  Plaintiff cites two cases—*Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991) and *Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997)—he claims clearly establish that Selmanson's decision to shoot Krause "in his own home" was unlawful.  Plaintiff's cases are so factually distinct from the instant case that it cannot be said these cases provide a "fair and clear warning," *Lanier*, 520 U.S. at 271, 117 S.Ct. 1219, to Selmanson that his acts were unlawful.  *Curnow* denied qualified immunity for officers where the suspect was completely inside his home when, without knocking and announcing, officers broke down the front door.  952 F.2d at 323, 325.  An officer located outside the residence watched the suspect through a window and shot the suspect after he reached for and raised a nearby firearm in response to the other officers' assault.  *Id.*  The facts here involved no forced entry, hidden officers, or surprise.  Rather, Krause began the incident at an open door already holding a shotgun. Krause had an unobstructed view of Selmanson.  Further, unlike in *Curnow*, where the *officers* initiated the emergent action, here *Krause*'s actions were escalatory as he failed to respond to orders then raised his shotgun before he was shot.  *Harris* is an even greater stretch.  126 F.3d 1189 (9th Cir. 1997).  The *Harris* officer was a sniper who, safely located on a hill, shot a retreating suspect who had made no threatening movements whatsoever.  *Id.* at 1203.  That

such conduct is "patently unreasonable . . . should have been plain to any reasonable officer." *Id.* This case is not remotely similar. Selmanson's multiple, clear commands to "drop the gun" far exceeded the minimal (or nonexistent) warnings in *Curnow* and *Harris.*[17]

Here, taking Plaintiff's version of events as true, the Court cannot conclude that Selmanson's belief that Krause threatened serious physical harm to either deputy was unreasonable. From the moment the door opened Krause's actions escalated the threat to the deputies. Krause began the confrontation holding a deadly weapon in his right hand. Rather than respond to lawful orders to drop his shotgun, Krause secured the shotgun with both hands, then began to raise it to ninety degrees. Viewing the totality of the circumstances, Krause's raising of the shotgun barrel is the type of "harrowing gesture . . . that might create an immediate threat." *George*, 736 F.3d at 838. These circumstances disclose substantial grounds for Selmanson to have concluded that he had a legitimate justification under the law for acting as he did. *Saucier*, 533 U.S at 208.[18] Selmanson is entitled to qualified immunity and summary judgment will be entered in his favor.

### b.  Count II: Denial of Medical Care

The Due Process Clause of the Fourteenth Amendment requires police officers to provide medical care to persons "who have been injured while being apprehended." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983); *Simmons v. Navajo County, Az.*, 609 F.3d 1011, 1017 (9th Cir. 2010). "With regards to medical needs, the due process clause imposes, at a minimum, the same duty the Eighth Amendment imposes: 'persons in

---

[17] Splitting semantic hairs, Plaintiff agrees that Selmanson gave Krause multiple commands, but maintains that "a command is not a warning." (MPSJ at 17.) Of course, the ability to warn may be cabined by circumstance. Warnings are preferred, but not required. *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997) (determining warnings generally should be given "whenever practicable" before employing deadly force) (citing *Garner*, 471 U.S. at 11–12, 105 S.Ct. 1694).

[18] Defendants are correct that "authority is legion that under similar circumstances, deadly force is justified." (Doc. 135 at 13-14 (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005); *Reynolds v. Cnty. Of San Diego*, 84 F.3d 1162, 1168 (9th Cir. 1996); *Prostrollo v. City of Scottsdale*, 2014 WL 4954392, at *6-12 (D. Ariz. 2014); *Villegas v. City of Anaheim*, 998 F. Supp. 2d 903, 908 n.8 (C.D. Cal. 2014)).)

- 21 -

custody ha[ve] the established right to not have officials remain deliberately indifferent to their serious medical needs." *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002), *cert. denied*, 537 U.S. 1106, 123 S.Ct. 872, 154 L.Ed.2d 775 (2003) (quoting *Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996)).  To state a claim for denial of medical care under § 1983, a plaintiff must show: (1) "a serious medical need by demonstrating that the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain"; and (2) that "the defendant's response to the need was deliberately indifferent." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).

### i.  A Serious Medical Need

A serious medical need exists "if the failure to treat a [detainee's] condition could result in further significant injury or the unnecessary or wanton infliction of pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991) *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (citation and internal quotation marks removed).  Although the deputies dispute that Plaintiff's injuries were obviously manifest, Selmanson had fired three shots at Krause and both deputies understood that Krause was likely seriously injured.  Plaintiff has met his burden here.

### ii.  Deliberate Indifference

Once a plaintiff establishes the existence of a serious medical need, he must show that officials responded to that need with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).  More than a showing of mere negligence, "deliberate indifference" is akin to a "reckless disregard for [an individual's] rights."[19] *Tennison v. City and Cnty of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009).

---

[19] The Court notes that the more deferential, "purpose to harm" standard, may apply. *See Porter v. Osborn*, 546 F.3d 1131, 1140 (9th Cir. 2008) ("In situations that escalate so quickly that the officer must make a snap judgement," " 'a much higher standard of fault . . . has to be shown for officer liability'.").  Under that standard, "a police officer violates the Fourteenth Amendment due process clause if he kills a suspect with the purpose to harm, unrelated to a legitimate law enforcement objective." *A.D. v. California Highway Patrol*, 712 F.3d 446, 450 (9th Cir. 2013).  Despite taking issue with the deputies' conduct, Plaintiff presents no evidence nor argues that Selmanson acted for reasons other than self-defense. *See Porter v. Osborn*, 546 F.3d at 1140 (clarifying that, under the purpose to harm standard, a plaintiff must show that officers acted with "the intent to inflict force beyond

1   "Deliberate-indifference cases are by their nature highly fact-specific . . . ." *Patel v. Kent*
2   *Sch. Dist.*, 648 F.3d 965, 975 (9th Cir. 2011).  Turning to these facts, it is evident that the
3   deputies did not act with deliberate indifference to Krause's medical needs.  The deputies
4   requested emergency medical services within sixty seconds of the shooting. (Doc. 143
5   (admitting DSOF ¶¶ 35-36).)  Emergency medical care arrived within eight minutes.  (*Id.*
6   (admitting DSOF ¶ 41).)  Plaintiff fails to cite any authority establishing that the deputies
7   prompt request for emergency medical care constitutes deliberate indifference.  *Contra*
8   *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986) ("Due process requires
9   that police officers seek the necessary medical attention for a detainee when he or she has
10  been injured while being apprehended by *either* promptly summoning the necessary
11  medical help *or* by taking the injured detainee to the hospital.").  There is no affirmative
12  duty for the officers to personally administer first aid as Plaintiff suggests.  *See id.* (finding
13  "no authority suggesting that the due process clause establishes an affirmative duty on the
14  party of police officers to render CPR in any and all circumstances").  Lastly, the deputies'
15  testimony also supports a contrary inference.  Both deputies testified that their choice to
16  refrain from personally rendering first aid stemmed from concerns of aggravating an
17  assumedly serious medical condition.

### iii.   Qualified Immunity

19      Defendants claim they are entitled to qualified immunity with respect to Plaintiff's
20  denial of medical care claim.  To this, Plaintiff says nothing and effectually concedes the
21  matter.  (*Compare* DMSJ at 12-13 *with* Doc. 142 at 18-20); *see* LRCiv 7.2(i); *Gonzales v.*
22  *City of Lake Havasu City*, No. CV-17-08205-PCT-GMS, 2019 WL 6726295, at *2 n.2 (D.
23  Ariz. Dec. 11, 2019).[20]   Defendants are correct, qualified immunity applies, and summary

that which is required by a legitimate law enforcement objective") (quoting *Davis v.*
*Township of Hillside*, 190 F.3d 167, 172 (3d Cir. 1999) (McKee, J., concurring).  The
deputies prompt call for medical assistance immediately following the shooting and
continued monitoring of Krause was clearly sufficient under the "purpose to harm"
standard.  This analysis is ultimately moot, however, as the deputies conduct also survives
the more exacting deliberate indifference standard as well.
[20] Defendants are entitled to qualified immunity on this claim as a matter of right too.  There
is no constitutional violation of the duty to provide post-arrest medical care to a defendant
because the deputies promptly radioed for emergency medical care.  *See Pearson*, 555 U.S.
at 231 (holding that to rebut a claim of qualified immunity, "the party asserting the injury

1  judgment on this claim will be granted.

2         **c.  Plaintiff's *Monell* Claims**

3         Plaintiff names the County of Mohave and its Sheriff, Douglass Lee Schuster and

4  his wife, Cynthia Schuster as defendants on multiple claims.   Municipalities like the

5  County of Mohave can be held liable under § 1983 if "action pursuant to official municipal

6  policy of some nature caused a constitutional tort."  *Monell v. Dep't of Soc. Servs. of New*

7  *York*, 436 U.S. 658, 691, 98 S.Ct. 658, 56 L.Ed.2d 611 (1978); *Hamilton v. Endell*, 981

8  F.2d 1062, 1067 (9th Cir. 1992); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Under

9  *Monell*, an official municipal policy is "a deliberate choice to follow a course of action . .

10  . made from various alternatives by the official or officials responsible for establishing final

11  policy with respect to the subject matter in question."  *Long v. Cty. of Los Angeles*, 442

12  F.3d 1178, 1185 (9th Cir. 2006) (quoting *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir.

13  2002)).  Municipal liability may also attach where evidence of "widespread practice . . . is

14  so permanent is well settled as to constitute a 'custom or usage' with the force of law,"

15  *Gillette v. Delmore*, 979 F.2d 1342, 1348-49 (9th Cir. 1992) (internal quotations omitted),

16  or when "inadequacy of police training . . . amounts to deliberate indifference to the rights

17  of persons."  *City of Canton v. Harris*, 489 U.S 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412

18  (1989).

19         Defendants raise two preliminary objections to Plaintiff's *Monell* claims.  First,

20  Defendants correctly argue that summary judgment is appropriate because, without

21  suffering a constitutional violation, "it is inconceivable" that the municipality could be held

22  liable.  (DMSJ at 13 (quoting *City of Los Aneles v. Heller*, 475 U.S. 796, 799, 106 S.Ct.

23  1571, 89 L.Ed.2d 806 (1986).)  As Selmanson's use of force was objectively reasonable in

24  the circumstances, Plaintiff's *Monell* claims cannot succeed.

25         Second, because Plaintiff developed no facts or allegations that Sheriff Schuster

26  was personally involved in the events giving rise to the action, Plaintiff's claim can only

27  be against Sheriff Schuster in his official capacity.  (DMSJ at 13-14.)  An official capacity

28  ───────────────────

[must] show that the official's conduct violated a constitutional right").

- 24 -

suit is, "in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *see also Ctr. for Bio-Ethical Reform v. L.A. Cty. Sheriff Dep't*, 533 F.3d 780, 786 (9th Cir. 2008) ("When both a municipal officer and a local government are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant."). Plaintiff offers no argument in response. Plaintiff's claims against Sheriff Shuster thus fail.[21]

### i. Count III: Failure to Train

In limited circumstances, a local government's decision not to train employees about their legal duties may rise to the level of an official government policy for purposes of § 1983. That said, municipal liability "is at its most tenuous where the claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 60, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011); *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (determining that an alleged "policy" of "inadequate training" is "far more nebulous, and a good deal further removed from the constitutional violation . . . ."). A plaintiff alleging liability on the basis of a municipality's failure to train must identify the deficiency in the municipality's training program which amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick*, 563 U.S. at 61, 131 S.Ct. 1350. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

Barring a showing of some "program-wide inadequacy in training," *Blankenhorn v. City of Orange*, 485 F.3d 463, 484-85 (9th Cir. 2007), Defendants see no way for this claim to succeed. (DMSJ at 14.) At the outset, they argue that Plaintiff simply cannot dispute

---

[21] Defendants ask the Court to construe Plaintiff's failure to contest as a concession that the *Monell* claims are brought against the Sheriff in his official capacity. That is one possibility. (*Compare* DMSJ at 13-14 *with* Doc. 142 at 21); *see* LRCiv 7.2(i); *Gonzales v. City of Lake Havasu City*, No. CV-17-08205-PCT-GMS, 2019 WL 6726295, at *2 n.2 (D. Ariz. Dec. 11, 2019). Irrespective of that failure, Plaintiff fails to establish facts necessary to support Schuster's personal liability.

the deputies were adequately trained—both Selmanson and Schiller completed all training requirements for Arizona's POST certification. (*Id.* at 14.) Plaintiff cannot, and he does not. (*See* Doc. 142 at 21-22.) From the off, Plaintiff's claim stands on shaky ground. *See e.g., Mendez v. Cnty. of San Bernadino*, 540 F.3d 1109, 1123 (9th Cir. 2008), *overruled on other grounds*, *Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014) (affirming dismissal where plaintiff failed to controvert evidence that officer's training met state POST requirements); *Hillbloom v. Cnty. of Fresno*, No. CV F 07-1467 LJO SMS, 2010 WL 4481770, at *34 (E.D. Cal. Nov. 1 2010).

Plaintiff's argument rests solely on the assertion that Defendants failed to train Selmanson and Schiller in the "standard police practice" of "surround and call out." (Doc. 142 at 21). But Plaintiff points to no facts or legal authority establishing that the County or Sheriff Schuster were on notice that the lack of such training would cause constitutional violations. *See Connick*, 563 U.S. at 62 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."). While Plaintiff may believe that the deputies should have conducted a "surround and call out," an unsupported assessment that the tactic the deputies employed constitutes deliberate indifference falls far short of establishing *Monell* liability. *See Tuttle*, 471 U.S. at 823, 105 S.Ct. 2427 (holding that "where the policy relied upon is not itself unconstitutional, considerably more proof than a single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation"). At most, construing the facts in Plaintiff's favor, his claims support a conclusion that otherwise adequately trained officers made mistakes. *See City of Canton*, 489 U.S. at 390, 109 S.Ct. 1197 (finding such mistakes "say[] little about the training program or legal basis for holding the city liable"). In sum, Plaintiff fails to raise a genuine dispute of material fact by pointing to evidence of any department wide-policy or deliberate indifference. Summary judgment on Plaintiff's failure to train claim is appropriate.

### ii.  Count IV and Other *Monell* Violations

Plaintiff alleges a variety of other *Monell* violations.  Specifically, Plaintiff briefly argues that constitutionally deficient MCSO policies were the moving force behind the violation of Krause's rights, that the deputies violated MCSO policies, and that the County and Sherriff Schuster failed to properly supervise the deputies, then ratified of the use of excessive force.  None of Plaintiff's arguments establish *Monell* liability.

### 1.  Failure to Supervise

Plaintiff concludes that the failure to notify a supervisor after the 911 call rises to the level of a constitutional violation, without addressing whether that decision resulted from a violation of standing MCSO policy, conformance with an MCSO policy or practice, or the fault of the MCSO at all.  Plaintiff points to no evidence showing that a requirement mandating a supervising deputies presence was "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [County] can reasonably be said to have been deliberately indifferent to the need."  *City of Canton*, 489 U.S at 390.  Even viewing the facts in Plaintiff's favor, any alleged failures constitute single incidents of misbehavior that cannot establish *Monell* liability as a matter of law.[22] *McDade v. West*, 223 F.3d 1135, 1141 (9th Cir. 2000); *see also Vaszquez v. City of Santa Paula*, 2015 WL 12734071 (C.D. Cal. Mar. 15, 2015) (holding that plaintiffs could not "establish *Monell* liability based on a single incident of unconstitutional conduct by a non-policymaking employee") (quoting *McDade*, 223 F.3d at 1141).

### 2.  Ratification

The argument that the County and Sheriff Schuster ratified the use of excessive force likewise falls short.  Ratification, asserted as a basis for municipal liability, requires Plaintiff to show that the authorized policymaker approved both a subordinate's decision and the basis for that decision. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).  To trigger liability under § 1983, a plaintiff must "prove[]

---

[22] Plaintiff's remaining arguments—that the deputies were unsupervised, that MCSO dispatchers failed to follow MCSO policies to notify a supervisor, and that the deputies failed to have EMS staged nearby prior to the incident—fail for the same reason.

the existence of an unconstitutional policy." *Id.* at 128, 108 S.Ct. 915. *See also Haugen v. Brosseau*, 543 F.3d 372, 393 (9th Cir. 2003) (internal quotation marks omitted), *rev'd on other grounds*, *Brosseau v. Haugen*, 543 U.S. 194, 160 S.Ct. 596, 160 L.Ed.2d 583 (2004) (holding that a policymakers decision must be "the product of a conscious, affirmative choice to ratify the [unconstitutional] conduct in question").   A single decision by a policymaker may be sufficient to trigger liability under *Monell*, "even though the decision is not intended to govern future situations," but the plaintiff must show that the triggering decision was the product of a "conscious, affirmative choice" to ratify the conduct in question. *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992) (citation omitted). Defendants are correct—Plaintiff's cursory conclusion that Sherriff Schuster "rubber stamped" the MCSO internal investigation, (Doc. 144 ¶ 19), does not establish that the outcome of the County's review of the shooting "was the product of a conscious, affirmative choice to ratify the [unconstitutional] conduct." *Frisby v. Town of Mammoth*, No. CV-16-02599-PHX-ROS, 2018 WL 4207989, at *5 n.4 (D. Ariz. Sep. 4, 2018).

### d.  Counts V & VI: Wrongful Death—Negligence and Battery

Defendants argue that Plaintiff's wrongful death claims "fail for the same reasons as his excessive force claim." (DMSJ at 17.)  A.R.S. § 13-413 precludes civil liability for "engaging in conduct otherwise justified" under Arizona law.  The use of deadly force is permissible under Arizona law if an officer reasonably believes that it is necessary "to defend himself or a third person from what the peace officer believes to be the use or imminent use of deadly physical force."  A.R.S. § 13-410(C)(1); *see also* A.R.S § 13-410(C)(2)(c) ("To effect the arrest or prevent the escape of a person whom the peace officer reasonably believes . . . [t]hrough past or present conduct of the person which is known by the peace officer that the person is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay."); *see also Garcia v. United States*, 826 F.2d 806, 812 n.14 (9th Cir. 1987) (applying Arizona law under Federal Tort Claims Act to hold that an officer was justified in using deadly force to prevent a "felonious and deadly assault" on himself by a suspect attacking with a rock and stick) (citing A.R.S. §

13-410).

Plaintiff's wrongful death, negligence and battery claims fail for (at least) five independent reasons.  First, because Selmanson reasonably believed the use of deadly force was necessary to protect himself from a countervailing deadly threat posed by Krause, he is statutorily immune from the Plaintiff's wrongful death claims.  *See Marquez v. City of Phoenix*, 693 F.3d 1167, 1176 (9th Cir. 2013); *Miller v. Clark Cnty.*, 340 F.3d 959, 968 n.14 (9th Cir. 2003) (affirming the district court's grant of summary judgment against plaintiff's state tort claims because they fell "along with [plaintiff]'s rejected federal Fourth Amendment claim").  Second, Plaintiffs do not rebut the applicability of Arizona's self-defense statutes to the facts of this case.  *See* A.R.S. §§ 13-405, -404, -410(C), -413.  Third, as Defendants argue, to overcome the invocation of Arizona's common law qualified immunity doctrine Plaintiff is required to plead and establish Selmanson and Schiller's gross negligence.  *See Merritt v. State of Arizona*, No. CV-17-04540-PHX-DGC, 2019 WL 6050237, at *21 (D. Ariz. Nov. 15, 2019).  Plaintiff does not do so.  Fourth, Plaintiff cannot assert negligence in commission of an intentional tort.  *Ryan v. Napier*, 245 Ariz. 54, 60 (2018) ("As the saying goes, there is no such thing as negligent battery.") (quoting Dan B. Dobbs et al., *The Law of Torts* § 31, at 77 (2d. ed. 2011).  Lastly, the County cannot be liable without a showing of independent negligence where the individual officers are found not liable.  *See Torres v. Kennecott Copper Corp.*, 488 P.2d 477, 479 (Ariz. Ct. App. 1971).

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** DENYING Plaintiff's Motion for Partial Summary Judgment, (Doc. 121).

**IT IS FURTHER ORDERED** GRANTING Defendants' Motion for Summary Judgment, (Doc. 139).

**IT IS FURTHER ORDERED** DIRECTING the Clerk of Court to enter Judgment and terminate this case.

1      **IT IS FURTHER ORDERED** VACATING all future court dates.

2

3      Dated this 18th day of May, 2020.

4

5

6                          Honorable Susan M. Brnovich
                              United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28